In re DEVONE S.

No. 99–449–Appeal.

Supreme Court of Rhode Island.

May 30, 2001.

Thomas J. Corrigan, Jr., Washington Crossing, Martha K. Diamond, Pawtucket, Frank P. Iacono, Jr., for Plaintiff.

Mark LaRoche, Providence, for Defendant.

Present WILLIAMS, C.J., LEDERBERG, BOURCIER, FLANDERS, and GOLDBERG, JJ.

## OPINION

PER CURIAM.

This case came before the Supreme Court on April 3, 2001, pursuant to an

order directing both parties to appear and show cause why the issue raised in this appeal should not be summarily decided. After hearing the arguments of counsel and reviewing the memoranda submitted by the parties, we are of the opinion that cause has not been shown. Therefore the case will be decided at this time.

The respondent-father, James Fisher (respondent), has appealed from a decree of the Family Court terminating his parental rights to his son, Devone, born November 26, 1993.[1] As the basis for his appeal, respondent argued that the trial justice erred in determining that he was unfit, pursuant to G.L.1956 § 15-7-7(a)(2); and, that he had abandoned his child, pursuant to § 15-7-7(a)(4).

The Department of Children, Youth and Families (DCYF) became actively involved in this case in April 1996 after it received a DCYF hotline call from Devone's maternal grandmother (grandmother) saying that Devone's mother, Kathy St. Jean (mother or St. Jean), had left baby Devone with her a few days earlier and had not returned or contacted her since then.[2] DCYF began to investigate the allegation of abandonment, and social caseworker Michaela Dolan (Dolan) was assigned to Devone's case.

On April 26, 1996, Dolan attempted to make a home visit based on her suspicions that St. Jean was using drugs and leaving Devone with inappropriate caretakers. When Dolan arrived, her repeated knocks on the door went unanswered and she was forced to leave and return with the Pawtucket police. At this point, although not permitted inside the home, Dolan was greeted by St. Jean and respondent outside the premises. The respondent became angry and told Dolan that he did not want anything to do with DCYF and he did not want DCYF at the house. In response to a question posed by Dolan concerning drug treatment, respondent said that he had just been released from the Adult Correctional Institutions (ACI) and he did not intend to participate in any drug treatment or have any involvement with DCYF. On May 3, 1996, DCYF removed Devone from the home and placed him with his maternal grandmother.[3] This ex-parte petition was based upon allegations that St. Jean was using narcotics. Dolan testified that following the April 26, 1996 encounter, she had no contact with respondent through July 1997, a period of fifteen months.

On May 13, 1997, DCYF filed a termination of parental rights petition pertaining to both parents.[4] On July 19, 1997, after approximately fifteen months of silence, respondent made his first contact with Dolan, a telephone call from the ACI, during which he requested a visit with his son. Dolan testified that she arranged for respondent to visit with Devone at the ACI on July 24, 1997. At the conclusion of the visit, Dolan informed respondent that he could call her to arrange the next visit.[5]

1. Although a number of the pleadings contained within the record refer to the child as "Devon," his birth certificate bears the name "Devone." For the purposes of this opinion, he shall be referred to as "Devone."

2. It was also reported that St. Jean had similarly left Devone with an unidentified male a few weeks earlier.

3. Additionally, the grandmother is the legal guardian of St. Jean's daughter, Brittany, and she has raised her since birth.

4. St. Jean was not included in this appeal. Her attorney indicated to the trial justice that St. Jean was considering a direct-consent adoption, but the record is unclear about whether that has occurred.

5. Dolan testified that she did not immediately arrange for another visit with respondent be-

Dolan testified that she was not contacted by respondent after the July 24, 1997 visit.

DCYF social caseworker Patricia Logan (Logan) took over responsibility for Devone's case in December 1997. It was not until January 1998 that Logan first met respondent at the Garrahy Judicial Complex (Family Court). Logan testified that respondent informed her that he had been paroled and planned to begin a drug treatment program at the Talbot House and also that he expected to have visits with Devone upon his release. Logan testified that she informed respondent that once he became settled he should contact her and she would set up visits. Notwithstanding this request, respondent made no further efforts to visit Devone.

Logan recounted that she came in contact with respondent again at Family Court on February 25, 1998. The respondent, who was still residing at the ACI, informed the court that he did not want to give up his rights to his child. Logan notified respondent that she would arrange visitation as soon as he was released from prison. The respondent made no attempts to contact DCYF through May 8, 1998.

Logan testified that she once again met respondent at Family Court, on May 8, 1998. At that time respondent informed Logan that he was in "Evaluation Stage One" at the Salvation Army, and he provided her with his address and the name of his counselor.[6] Logan told respondent to call her to arrange a visit. But, consistent with his past behavior, respondent never contacted her.

Logan did not come in contact with respondent again until November 20, 1998,

one week before the child's fifth birthday and again at a court hearing. At that point, respondent had been sent back to the ACI, and it was mutually agreed that visits would resume after he was released. Logan indicated that respondent did not contact DCYF any time after November 20, 1998. Logan also testified that Devone's sole placement was with his grandmother, and the child was doing well. She also indicated that DCYF's case plan goal for the child was adoption by his grandmother.

A termination hearing was held in Family Court on May 5, 6, and 10, 1999. During the hearing, respondent said that he and the child's mother had been involved for thirteen years. The respondent also testified that he was presently serving a ten-year sentence for unlawful delivery of cocaine. The respondent informed the court that although St. Jean requested that he not speak with Dolan or DCYF, he called the social caseworker "about a hundred and fifty times" repeatedly requesting visits with Devone at a time when he was not incarcerated but that Dolan "more or less brushed [him] off." The respondent maintained that he "bent over backwards trying to get in contact" with DCYF while both in and out of prison. He further testified that on the few occasions he was able to speak with either Dolan or Logan, they never discussed any case planning with him nor were any services provided to him. The respondent explained that he never saw the need to contact DCYF for visits from March 1998 through July 1998 because St. Jean would bring Devone to see him. However, the grandmother testi-

cause she did not have her appointment book. She also said that she was not permitted to call the ACI to set up another visit.

**6.** According to Logan, "Evaluation Stage One" is a community-based halfway house

that provides group counseling and urine tests, and assists members in maintaining their sobriety during their reintegration into the community.

fied in rebuttal that St. Jean had never taken Devone out alone and, other than DCYF arranged visitation, there had never been any visits between respondent and Devone. Ultimately, respondent testified that he never felt that he needed to contact DCYF while Devone was in its care because he felt that Devone "shouldn't have been involved with this [DCYF] from day one."

The trial justice issued a written decision and concluded that DCYF had proven by clear and convincing evidence that respondent had abandoned his child and was therefore an unfit parent. Upon reviewing the evidence submitted to the court, the trial justice found that "respondent [had] not had *any* contact or communication with this child for at least six months." The court further noted,

> "with the exception of one visit on July 24, 1997, [respondent] has never contacted, inquired or requested to visit with this child. Although the Respondent did motion this [c]ourt for visitation in November of 1998, the [c]ourt finds that that motion was essentially a response to defeat the Department's allegation of abandonment. * * * Based upon this, the [c]ourt finds by clear and convincing evidence that the Department has met their burden and has established a prima facie case of abandonment. Furthermore, this Respondent has had a history of ignoring the welfare of this child. * * * He has neither visited with this child, nor has shown any indication of planning for this child's future. Therefore, the [c]ourt finds by clear and

convincing evidence that the Respondent is an unfit parent."

Based upon these findings, the trial justice concluded that the termination of respondent's parental rights was in the best interest of Devone. A Family Court decree reflecting the trial justice's decision was entered on July 27, 1999.

▇▇▇ We are satisfied that there is ample evidence in the record to support the trial justice's finding of abandonment. We have previously held that in order to establish a *prima facie* case of abandonment under § 15–7–7(a)(4), "DCYF merely needs to demonstrate a lack of visits or contact with the child for the statutory six-month period." *In re Cody F.*, 766 A.2d 937, 939 (R.I.2001) (citing *In re Craig G., Jr.*, 765 A.2d 1200 (R.I.2001)). DCYF removed Devone from his parent's home in May 1996. After reviewing the evidence, the trial justice found that with one exception in July 1997, respondent had never contacted DCYF nor requested visitation with his child. This finding represented a period significantly greater than the six-month statutory limit. We are therefore satisfied that DCYF established, by clear and convincing evidence, a *prima facie* case of abandonment.

▇▇▇ We are equally satisfied that the evidence in the record supports the trial justice's finding of unfitness. Section 15–7–7(a)(2) provides: "The parent is unfit by reason of conduct or conditions seriously detrimental to the child * * *." In addition, § 15–7–7(a)(2) sets forth a non-exclusive list of conduct or conditions to be considered by the court when determining the unfitness of a parent.[7] Here, the court

---

7. General Laws 1956 § 15–7–7(a)(2)(i)(vii) provides:

"(i) Institutionalization of the parent, including imprisonment, of such a duration that renders it improbable for the parent to care for the child for an extended period of time;

"(ii) Conduct toward any child of a cruel or abusive nature;

"(iii) The child has been placed in the legal custody or care of the department for children, youth, and families and the parent has a chronic substance abuse problem, and the parent's prognosis indicates that the child will

was presented with a plethora of examples of conduct and circumstances that the court found were seriously detrimental to the best interests of the child. The respondent testified that he had been incarcerated for two years in 1996 and that he was then serving a ten-year sentence on drug related charges. The respondent also testified about his chronic substance abuse. In addition, as we have noted, the trial justice properly found that respondent had abandoned his child. Although not exclusive, these evidentiary examples are explicitly identified in § 15–7–7(a)(2) as evidence of unfitness. Therefore, based on the above, we agree with the finding that DCYF met its burden to establish a *prima facie* case of unfitness.

 Finally, we reject respondent's contention that DCYF failed to make reasonable efforts to encourage and strengthen the family relationship. This Court has required that the parent, not DCYF, whose children are in the care of an authorized agency is responsible to substantially and repeatedly maintain contact with the children. Further, we have repeatedly stated that in abandonment situations, pursuant to § 15–7–7(b)(1), "in the event that

a petition to terminate parental rights is filed pursuant to § 15–7–7(a)(4), 'the department has no obligation to engage in reasonable efforts to preserve and reunify a family.' " *In re Ariel S.,* 765 A.2d 846, 848 (R.I.2001); *see also In re Cody F.,* 766 A.2d 937, 939 (R.I.2001); *In re Craig G., Jr.,* 765 A.2d 1200, 1203 (R.I.2001).

Accordingly, the respondent's appeal is denied and dismissed. The judgment of the Family Court terminating the father's parental rights is affirmed and the papers in this case are remanded to the Family Court.

not be able to return to the custody of the parent within a reasonable period of time, considering the child's age and the need for a permanent home. The fact that a parent has been unable to provide care for a child for a period of twelve (12) months due to substance abuse shall constitute prima facie evidence of a chronic substance abuse problem;

"(iv) The child has been placed with the department for children, youth, and families and the court has previously involuntarily terminated parental rights to another child of the parent and the parent continues to lack the ability or willingness to respond to services which would rehabilitate the parent; and provided, that the court finds it is improbable that an additional period of services would result in reunification within a reasonable period of time considering the child's age and the need for a permanent home;

"(v) The parent has subjected the child to aggravated circumstances, which circumstances shall be abandonment, torture, chronic abuse and sexual abuse;

"(vi) The parent has committed murder or voluntary manslaughter on another of his or her children or has committed a felony assault resulting in serious bodily injury on that child or another of his or her children or has aided or abetted, attempted, conspired or solicited to commit such a murder or voluntary manslaughter; or

"(vii) The parent has exhibited behavior or conduct that is seriously detrimental to the child, of a duration that renders it improbable for the parent to care for the child for an extended period of time[.]"