In re SAMSON P.

No. 2000–202–Appeal.

Supreme Court of Rhode Island.

June 21, 2001.

Thomas J. Corrigan, Jr., Washington Crossing, PA, for Plaintiff.

Frank P. Iacono, Jr., Frances K. Munro, Kelly Monteiro, Providence, for Defendant.

Present WILLIAMS, C.J., LEDERBERG, BOURCIER, FLANDERS, and GOLDBERG, JJ.

**OPINION**

PER CURIAM.

This case came before the Supreme Court on May 17, 2001, pursuant to an order directing the parties to appear and show cause why the issues raised in this appeal should not be summarily decided. After hearing the arguments of counsel and reviewing the memoranda submitted by the parties, we are of the opinion that cause has not been shown. Therefore, the case will be decided at this time.

The respondent-mother, Natalie Peixoto (mother), and the respondent-father, Ricardo Crawford (father) (collectively respondents or parents), appealed from a decree of the Family Court terminating their parental rights to their son, Samson, born on December 24, 1993. The respondents asserted separate issues on appeal. The mother argued that the Family Court erred in determining that her mental illness rendered her unfit, pursuant to G.L. 1956 § 15–7–7(a)(2), to care for Samson because no evidence was presented to support the conclusion that she is incapable of parenting her son. Further, she asserted that the Family Court erred when it found that the Department of Children, Youth and Families (DCYF) provided her with

proper services, pursuant to § 15–7–7(a)(3) and (b)(1); and, that she was incapable of availing herself of the medical training necessary to provide Samson with sufficient care for his special medical needs. The father argued that the trial justice erred in finding him unfit, pursuant to § 15–7–7(a)(2), in light of the fact that DCYF failed to provide him with any individual case planning, that Samson's medical condition had vastly improved since his initial commitment to the state, and that he and Samson had developed a strong father/son relationship.

It is important to note at the outset that both parents have a long history of mental illness. The mother, not currently on medication, was diagnosed with schizophrenia and testified that she has visual and auditory hallucinations. Similarly, the father was diagnosed with a schizoaffective disorder that is difficult to manage because of mood disorder symptomatology. As a result, the father tends to remain depressed. The father testified that he has episodes approximately two times per month, and if he does not take his medication "it can be bad."

The following facts are pertinent to this appeal. In July 1994, the mother took Samson to the doctor after he began to suffer from respiratory problems. Samson was immediately hospitalized because of serious respiratory problems that consisted of a severely narrowed airway and chronic lung disease. DCYF first became involved with Samson in September 1994, amid allegations of medical neglect stemming from the parents' failure to attend classes designed to train them to care for Samson's special medical needs.

The first social caseworker assigned to Samson's case was Kathy Boday (Boday). Boday developed with the parents five case plans that included objectives requiring the parents to maintain positive mental health and to develop better parenting skills. The case plans also required the mother to maintain positive physical health. Neither parent signed any of these case plans.

Christine Chase (Chase) was assigned to Samson's case in August 1996. At that time, Samson was in a non-relative foster home. The case plan goal was for the child's reunification with his mother. Chase stressed to the mother the need for her to receive mental health treatment and worked with her to arrange various services, including a mental health evaluation at Providence Center. However, the mother never completed the evaluation.

Chase testified that the father did not have a separate case plan because he supported Samson's reunification with the mother. The parents were not married nor did they reside in the same household. Nonetheless, the case plans addressed his ability to maintain treatment at the Veteran's Hospital. The father confirmed at the hearing that he never sought placement of Samson because he did not feel it was an option. The father remained involved with the mother's case planning and services, notwithstanding the lack of a separate case plan for him. In fact, the evidence disclosed that the father was very involved with visitation.

Chase testified that the family met bi-weekly for visits with Samson through a program sponsored by the Providence Children's Museum. However, the mother was "very passive" with Samson and did not generally interact with him during these visits. Heidi Brinig (Brinig), the program director at the Children's Museum, also testified that although the parents usually visited together, when the mother visited alone the visits were less structured because she had difficulty setting limits for Samson. Brinig explained that visits were better when both parents attended be-

cause the father provided Samson with more direction. Despite this positive involvement by the father, Brinig testified that the father often was unwilling to accept the suggestions of her staff because he did not believe that they had the right to tell him how to raise his child.

In April 1995, after experiencing little progress with the mother's mental health goals, DCYF requested that the mother receive a psychological evaluation to determine her capacity to parent. Doctor John Parsons (Dr. Parsons), a clinical psychologist, conducted a three-session evaluation and concluded that the mother "scored within the very lowest limits of the borderline range of general intelligence." He also found that she had difficulty distinguishing between fantasy and reality, evidenced by, among other things, her belief that she could heal her children by laying her hands on them. Doctor Parsons concluded that given the mother's psychological and cognitive limitations, he had "significant concerns about anybody [with] that combination of facts being an effective parent * * *." Based upon his evaluation, he recommended that the mother undergo an evaluation for psychotropic medication, undertake psychotherapy, have a parent aide in the home to monitor the situation, and attend parenting classes.

Doctor Judith Shaw (Dr. Shaw), Samson's pediatrician since November 1994, and Susan Bessette (Bessette), a nurse and supervisor with Interim Health Care, testified concerning the specialized care required for Samson's respiratory condition. Among the issues identified by both Dr. Shaw and Bessette were that Samson required a feeding tube, intermittent bronchoscopes, both speech and occupational therapy, monitoring of his three inhaled medications and oxygen, and occasionally required a ventilator. In Dr. Shaw's opinion, Samson's caretaker must be able to understand Samson's nutritional and medical needs. Specifically, she believed that the caretaker needed to develop techniques for feeding, learn how to administer the inhaled medications, and monitor Samson's oxygen saturation.

Based upon the significant medical needs of the child, the parents' collective inability to follow through with the medical training necessary to address those needs, and the mother's failure to deal with her own mental condition, DCYF filed an *ex parte* petition for custody. On December 13, 1995, the parents admitted to dependency and Samson was placed in DCYF custody.

On May 10, 1999, pursuant to § 15–7–7(a)(2)(i) and (a)(3), DCYF filed a petition to terminate both parents' parental rights to Samson. The grounds for the petition included allegations that the parents were unfit by reason of conduct or conditions seriously detrimental to the child, including emotional or mental illness of such a duration as to render it improbable for the parent to care for the child for an extended period; and secondly, the child has been in DCYF custody for at least twelve months and there was not a substantial probability that the child would be returned to his parents within a reasonable period.

At the termination hearing, it was disclosed that Samson was then in a preadoptive placement with a specialized foster care nurse who is "incredibly nurturing" and "very bonded" to him. In addition, Bruce Moffat (Moffat), a DCYF investigator, testified that the child's father had told him that "the family was intimidated" by Samson's medical problems and wanted him to remain hospitalized until he was better. Moffat also testified that the mother informed him that although she was comfortable caring for Samson, she was aware that she

lacked the skills necessary to properly address his medical needs and that she was afraid to participate in parenting classes.

The parents also testified at the hearing. The mother testified that she had tried to adjust the tracheotomy tube but did not like to touch it because it was "gross." In addition, she acknowledged that she had been diagnosed with schizophrenia and had assaulted her mother because she was "evil." The father testified that he does not live with the mother because he does not like the children to see him when he is sick. He stated that he took classes to learn how to care for Samson and felt that he was "more than capable of taking care [of him]." Further, the father indicated that although he would like to see Samson reunified with his mother, if placement with the mother was not an option he wanted Samson placed with him.

The eleven-day hearing on the petition concluded on January 5, 2000, and the trial justice issued a written decision on February 1, 2000. After reviewing the testimony and evidence presented to the court, the trial justice determined that both parents were "emotionally and mentally unable to meet the responsibility of caring for this special needs child." The trial justice also determined that both parents had been offered services to help meet Samson's needs. Moreover, although he recognized that Samson's medical problems had improved somewhat since he was placed with DCYF, the trial justice found that the medical needs are "still substantial" and the parents' are unable to properly care for the child. Thus, the trial justice concluded that "both parents [are] unfit to care for Samson due primarily to the special needs of the parents, coupled with the special needs of the child * * *." A decree terminating the parental rights of both parents to Samson

was entered on February 3, 2000. Both parents filed a timely appeal.

We are satisfied that there is ample evidence in the record to support the trial justice's finding of unfitness. Section 15–7–7(a)(2) provides that "[a] parent is unfit by reason of conduct or conditions seriously detrimental to the child * * *." Moreover, "§ 15–7–7(a)(2) sets forth a non-exclusive list of conduct or conditions to be considered by the court when determining the unfitness of a parent." *In re Devone S.*, No. 99–449 A., slip op. at 6, —— A.2d ——, ——, 2001 WL 586737 (R.I., filed May 30, 2001). Pursuant to § 15–7–7(a)(2)(vii), the court may, among other things, consider behavior or conduct exhibited by the parent "that is seriously detrimental to the child, of a duration that renders it improbable for the parent to care for the child for an extended period of time."

Based upon the overwhelming evidence presented to this Court concerning the parents' collective cognitive and psychological deficiencies, we are of the opinion that DCYF met its burden to establish a *prima facie* case of unfitness. This evidence of unfitness, coupled with the highly specialized care required for Samson, leads us to conclude that the trial justice properly determined that the parents were unfit pursuant to § 15–7–7(a)(2).

Finally, we reject the parents contention that DCYF failed to provide proper services pursuant to § 15–7–7(a)(3) and (b)(1). Boday [testified that she] prepared five case plans to help the parents obtain the needed skills to effectively parent this child. Over the course of a year, approximately eighteen visits were organized through the Children's Museum. Chase testified that she organized various services for the mother, including an evaluation at the Providence Center, that the mother failed to complete. Further, the

parents were offered parent aide services, and services through Early Intervention and the mother was evaluated to determine her capacity to parent. Moreover, DCYF repeatedly emphasized to the mother that her resistance to mental health treatment would have an adverse impact on her ability to reunite with Samson.

Based upon the foregoing, we are of the opinion that DCYF provided the mother with a range of available assistance directed toward achieving the case plan goal of reunifying Samson with his mother. Therefore, we conclude that the trial justice did not err in finding that DCYF provided the mother with proper services pursuant to § 15–7–7(a)(3) and (b)(1).

Accordingly, the respondents' appeal is denied and dismissed. The judgment of the Family Court terminating the parents' parental rights is affirmed and the papers in this case are remanded to the Family Court.