**In re AMANDA D. et al.**

**No. 2006–132–A.**

Supreme Court of Rhode Island.

April 3, 2007.

Paula Lynch, Esq., for Petitioner.

Karen A. Clark, Esq., for DCYF.

Frank J. Iacono, Jr., Esq., for CASA.

Present: WILLIAMS, C.J., and GOLDBERG, FLAHERTY, SUTTELL, and ROBINSON, JJ.

### OPINION

Chief Justice WILLIAMS, for the Court.

The respondent father, Dennis D. (respondent or father), appeals a decree of the Family Court terminating his parental rights as to his two minor children, Amanda and Dennis Jr. (collectively children), based on a finding of abandonment.[1] This case came before the Supreme Court for oral argument on January 22, 2007, pursuant to an order directing the parties to show cause why the issues raised in this appeal should not summarily be decided. After hearing the arguments and examining the record and the memoranda that the parties filed, we are of the opinion that this appeal may be decided at this time without further briefing or argument. For

---

1. On August 4, 2005, the children's mother, Claudette B., signed a direct-consent adoption agreement as to both Amanda and Dennis Jr. She is not a party to these proceedings.

the reasons hereinafter set forth, we affirm the decree of the Family Court.

# I

## Facts and Travel

Amanda and Dennis Jr.'s first contact with the Department of Children, Youth and Families (DCYF) occurred on August 14, 1994, the date of Dennis Jr.'s birth, when both Dennis Jr. and his mother, Claudette B. (Claudette or mother), tested positive for cocaine. Although the initial DCYF case file was closed in August 1995, this unfortunately did not mark the end of DCYF"s contact with the family.

Due to the actions of their parents, resulting in much disruption in the children's lives, the family has had significant contact with DCYF. In September 1998, DCYF opened a file on the family based on allegations of neglect, lack of supervision, and inadequate shelter. At the time, respondent was incarcerated at the Adult Correctional Institutions (ACI) in Cranston. Again, DCYF provided the family with services and closed the file in 2000.

DCYF had no further involvement with the family until 2003, when DCYF opened yet another file on the family, this time eventually taking the children into custody and placing them in the foster home where they remain to this day. The 2003 case opened in response to a hotline call to DCYF reporting concerns about Claudette's inappropriate behavior and the condition of her home where her children resided. At the time, respondent again was incarcerated at the ACI.

The respondent and Claudette failed to comply with their case plans, and the Family Court entered findings of neglect against both parents.[2] On August 4, 2005,

Claudette voluntarily executed direct-consent adoption agreements as to both children. On August 18, 2005, DCYF filed petitions in the Family Court seeking to terminate respondent's parental rights to both Amanda and Dennis Jr. pursuant to a Family Court order entered on August 17, 2005. The Family Court held a hearing on these petitions on April 7, 2006.

DCYF social caseworker Tracey Bonang testified at the hearing that she was assigned to respondent's family's case in March 2005. At that time, both parents were struggling with substance abuse issues, and respondent was incarcerated and had not contacted DCYF from the ACI. DCYF"s case file contained no record of respondent's involvement in any prison services. However, Ms. Bonang admitted that she did not visit respondent while he was incarcerated, nor did she refer him for services within or outside of the prison.

Ms. Bonang testified that she first met with respondent shortly after his release in April 2005. At this meeting, they discussed the goals that would be included in his case plan—cooperate with mental health evaluation, cooperate with substance abuse evaluation, domestic violence services, anger management services, inform DCYF of any residence changes, and provide a safe, stable, nurturing environment for the children. They also discussed the possibility of scheduling visits between respondent and his children.

According to Ms. Bonang, at the time of their meeting respondent had not seen his children in about one year because the children did not want to visit their father in prison. She testified that the previous caseworker had scheduled visits for respondent and his children during times

---

2. The Family Court found that respondent had neglected his children based on a default. Testimony at trial indicates that DCYF had sent notice of the proceeding to the wrong address.

when respondent was not incarcerated, but that respondent had not attended those visits. Ms. Bonang spoke to both Amanda and Dennis Jr. about visiting their father after he had been released from prison, and they indicated that they wanted to see him.

Over the next few months, Ms. Bonang scheduled three supervised visits between respondent and his children. She scheduled the first visit for May 12, 2005, but respondent failed to call and confirm the day before the visit, and it was canceled. The second visit was scheduled for May 27, 2005. The respondent did not arrive at the time the visit was scheduled. Dennis Jr. and Amanda waited with Ms. Bonang before asking whether they could call their father to see if he would be coming. Ms. Bonang attempted to call respondent, but his phone was out of service. The respondent never arrived. As a result, his children were very upset. Ms. Bonang testified that she subsequently contacted inmate records through the ACI a few weeks later and discovered that respondent again had been incarcerated, this time on the evening before the missed visit. Ms. Bonang testified that when respondent was released from the ACI she scheduled another visit for July 15, 2005. Once again, respondent did not attend the visit.

On August 4, 2005, a Family Court review hearing of respondent's family's progress took place. According to Ms. Bonang, respondent arrived at the courthouse before the hearing and informed her that he was living at Crossroads and receiving services through CODAC Behavioral Health Services, Inc. (CODAC). He signed releases so that Ms. Bonang could contact all of his service providers except for CODAC

because he wanted first to speak to his clinician.[3] The respondent left before the review hearing, at which the hearing justice ordered that DCYF schedule no further visits for respondent because of his lack of cooperation, failure to visit his children, and ongoing incarceration.

According to Ms. Bonang's records, respondent was imprisoned twelve times between 1993 and 2004, five of which occurred after DCYF opened the case in 2003. She further testified that respondent had not visited with, provided financial or emotional support for, or had any contact with his children in more than a year, and she also reported that the children were doing wonderfully in their pre-adoptive foster home.

The respondent also testified at the termination of parental rights hearing. He then was incarcerated at the ACI and had been so incarcerated since September 2005. He admitted that during the thirty-two months leading up to the hearing, he had "pretty much lived at the ACI" except for brief periods of release between a twenty-month sentence, a subsequent ten-month sentence, and the twelve-month sentence he was serving at the time for felony domestic assault and possession of heroin.

The respondent said that he cared for his children at one point between prison terms from approximately September 2001 until February 2002, when he again was incarcerated. The respondent claimed that he called DCYF from the ACI numerous times, but that the department did not accept his collect calls. He also testified that he wrote letters to his children while incarcerated and sent them to DCYF's

---

**3.** Ms. Bonang's testimony indicated that she never contacted the service providers for whom she had obtained signed releases.

North Kingstown office, but never received a reply.

The respondent testified that, after his release from the ACI in 2004, he did not know where his children were living, so he contacted DCYF. He said that he visited with his children twice in 2004 when DCYF scheduled visits and missed only two visits due to his incarceration and time at Butler Hospital. DCYF records, however, indicate that respondent missed all visits scheduled during this period of release.

The respondent again was incarcerated in June 2004 through April 2005. Upon his release, he contacted DCYF to schedule a visit with his children, but he testified that Ms. Bonang never returned his frequent calls and messages, so he spoke with her supervisor twice. The respondent testified, however, that a mere three weeks after his release he met with Ms. Bonang in person, and told her about his involvement with CODAC's methadone clinic and domestic violence classes, Crossroads, and the Vista Program. He also signed releases for all of his service providers except for CODAC.

The major disparity between respondent's and Ms. Bonang's testimony relates to how many visits DCYF scheduled. The respondent testified that Ms. Bonang *never* scheduled a visit for him with his children and said that the only time Ms. Bonang was going to allow respondent to see his children was the day after the August review hearing, but because the hearing justice suspended his visitation rights at the hearing the visit never occurred.

The respondent acknowledged that his only contact with his children in more than a year was a letter he received from each of them saying that they knew that he loved them, but that they wanted him to stop fighting for custody and instead let them be adopted by their foster parents.

On April 7, 2006, the trial justice terminated respondent's parental rights to both of his children after finding that DCYF had made a prima facie case for abandonment. In support of this finding, the trial justice stated:

"Sir, when you lead a lifestyle that results in your being locked up periodically for whatever, in your case possession of heroin, domestic assaults, violation of suspended sentences, that routinely keeps you away from providing or being a father for your children, that is adequate from the Department's point of view when they present a case regarding the first allegation for termination here, namely abandonment. You have effectively abandoned your children. You have not seen them for a period of at least six months. Long before that you have not made yourself available to be a father to these children."

An order was entered on April 17, 2006, terminating respondent's parental rights to his two children. The respondent timely appealed to this Court.

## II

### Analysis

On appeal, respondent contends that the trial justice erred in concluding that he abandoned his children by his "actions and incarcerations" because he ˏ repeatedly made efforts to contact his children and DCYF both while incarcerated and during the short periods between his incarcerations. We disagree.

### A

#### Standard of Review

██ This Court reviews termination of parental rights rulings by examining the record to determine whether the trial justice's findings are supported by legally

competent evidence. *In re Alvia K.*, 909 A.2d 498, 503 (R.I.2006). The trial justice's findings are "entitled to great weight and will not be disturbed unless the findings are clearly wrong or unless the trial justice overlooked or misconceived material evidence." *In re Ariel N.*, 892 A.2d 80, 83 (R.I.2006) (citing *In re Shawn B.*, 864 A.2d 621, 623 (R.I.2005)). With these principles in mind, we turn our attention to respondent's appeal.

## B

### Abandonment

■ General Laws 1956 § 15–7–7 sets forth the procedure for terminating parental rights. The statute provides for the termination of a parent's rights when "[t]he parent has abandoned or deserted the child." Section 15–7–7(a)(4). A prima facie case of abandonment is established when there is evidence of a lack of communication or contact between the parent and the child for a period of at least six months. *Id.* Moreover, DCYF has no obligation to engage in reasonable efforts to preserve and reunify the family under an allegation of abandonment. Section 15–7–7(b)(1).

Giving the trial justice's findings the deference they are due, we are of the opinion that respondent's argument on appeal is unpersuasive and in direct conflict with the evidence presented. It is *undisputed* that respondent failed to visit or communicate with his children for at least twenty months. This easily satisfies the six-month statutory period that constitutes prima facie evidence of abandonment under § 15–7–7(a)(4).

■ Furthermore, contrary to respondent's argument that DCYF "frustrated, rather than encouraged" his attempts to maintain a relationship with his children by failing to consult and cooperate with him in developing a plan while he was incarcerated, the evidence presented at trial shows that it was respondent's own actions that stymied contact with his children. Moreover, it is "the parent, not DCYF, whose children are in the care of an authorized agency [who] is responsible to substantially and repeatedly maintain contact with the children." *In re Shaylon J.*, 782 A.2d 1140, 1143 (R.I.2001) (quoting *In re Devone S.*, 777 A.2d 1268, 1272 (R.I. 2001)).

Although respondent vehemently argues that he did "everything in his power to maintain a relationship with Amanda and Dennis Jr. despite the circumstances of his incarceration," respondent's actions speak louder than his words. The respondent failed to attend at least three DCYF-scheduled visits. He wrote, at most, one letter to his children while incarcerated, which was not received by DCYF or his children. In addition, even though respondent knew that his children were unwilling to visit him at the ACI, he continued to engage in illegal activities that resulted in his repeated incarceration.

In light of the abundant evidence presented at trial demonstrating the respondent's lack of contact with his two children for a period exceeding six months, we conclude that the trial justice was not clearly wrong and did not misconceive material evidence in finding that the respondent abandoned his children.

### Conclusion

For the aforementioned reasons, we affirm the Family Court judgment terminating the respondent's parental rights. The papers in this case are remanded to the Family Court.