Justice Flaherty,
dissenting.
I respectfully dissent from the holding of the majority in this case. I do so because it is my opinion that the respondent has sufficiently rebutted the prima facie evidence of abandonment, thereby triggering an obligation for the Department of Children, Youth, and Families (DCYF) to prove that he abandoned his child by clear and convincing evidence. In my view, this has not been done.
There is no doubt that respondent was confronted by substantial obstacles that *1161 stood in the way of contacting his son. He was incarcerated in another state and was apparently moved from facility to facility. Indeed, DCYF, with all its impressive resources, found it difficult to locate respondent, even for the purpose of serving him with process after it filed its termination case.
The majority holds that respondent abandoned his son because he did not adequately maintain contact with Malachii over the course of roughly two years. While it is true that there was a paucity of contact initiated by respondent, it is extremely significant that he was barred from contacting Malachii, and the state agency that had custody of Malachii never contacted respondent. Notwithstanding his incarceration and the other legal barriers to communication, respondent did make two efforts, through DCYF, to reunify Malachii with his family. In light of this, and after carefully reviewing the record, I conclude that the trial justice erred, that respondent has rebutted the prima facie inference of abandonment, and that his unfitness by means of abandonment was not proven by clear and convincing evidence.
We have long recognized that “[njatural parents have a fundamental liberty interest in the care, custody, and management of their child that does not evaporate if they are not model parents or have lost temporary custody of their child.” In re Antonio G., 657 A.2d 1052, 1057 (R.I. 1995) (citing Santosky v. Kramer, 455 U.S. 745, 753, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982)). The “rights to the custody, care, and nurturing of a child first reside with the parents, and ‘until the [sjtate proves parental unfitness, the child and his parents share a vital interest in preventing erroneous termination of their natural relationship.’ ” In re Kristen B., 558 A.2d 200, 203 (R.I. 1989) (quoting Santosky, 455 U.S. at 760, 102 S.Ct. 1388). The state has the ultimate burden of proving unfitness by clear and convincing evidence. General Laws 1956 § 15-7-7(a).
Although the trial justice terminated respondent’s parental rights on the bases of abandonment and institutionalization, the majority affirms the Family Court’s finding of unfitness solely on the basis of abandonment. As the majority correctly notes, DCYF is not required to make reasonable efforts at reunification before the agency institutes termination proceedings on grounds of abandonment. Section 15-7-7(a)(4), (b)(1). The state may also present prima facie evidence of abandonment by proving that more than six months have passed during which a parent did not contact his or her child. Section 15-7-7(a)(4).
Here, respondent did not contest the fact that he had not seen Malachii for a period in excess of six months. Nonetheless, it bears noting that the state bore a heavier burden in proving the ultimate fact of unfitness than respondent did in producing some evidence to rebut the state’s basic prima facie showing. See § 15-7-7(a).[1]
*1162 In my view, respondent rebutted the prima facie evidence of abandonment when he demonstrated that he was legally and practically precluded from contacting his son during the time in which the state claims he abandoned Malachii. It should go without saying that DCYF had a unique ability to increase the prospects for family reunification, slight as they may have been, during the relevant time period because the child was in its custody. Rather than explore those prospects for reunification, however, DCYF foreclosed them. It is my opinion that the events leading up to the Family Court’s termination decree leads to the inevitable conclusion that the agency helped “to shape the historical events that form[ed] the basis for termination.” Santosky, 455 U.S. at 763, 102 S.Ct. 1388.
The respondent lost custody of Malachii following a violent domestic altercation in March 2012, in which his then ten-month-old son was injured. Shortly thereafter, the Family Court issued a no-contact order, an order that remains in effect to this day. That order unequivocally bars respondent from contacting Malachii.
For his part, respondent requested a paternity test in August 2012. The respondent said that he requested the test to establish his rights to his son so that he could place Malachii with his family. In September 2013, respondent was convicted of reckless endangerment of a child and assault and battery with a dangerous weapon, for which he received a sentence of three to five years with two-and-a-half years of probation.
Armed with the no-contact order, DCYF then unilaterally determined that it would not attempt to reunify respondent with his son. Malachii’s caseworker testified that “[bjecause there was a no-contact order in place between [respondent] and the child, * * * he was not a parent that we were looking to reunify * *
A month after respondent had begun to serve his sentence, his paternity was verified. The respondent then sent a letter to Malachii’s caseworker asking that Malachii be placed with his grandparents and for respondent’s mother to be appointed as Malachii’s legal guardian. Shortly thereafter, DCYF instituted proceedings to terminate respondent’s parental rights.[2]
It is significant that, for some reason, the state opted not to charge respondent with unfitness on the ground of cruelty to a child, even though he had been criminally punished for the child’s injuries. Section 15—7—7(a)(2)(ii).[3] Nonetheless, it seems obvious to me that the criminal conviction in Massachusetts plainly influenced the decisions of the majority of this Court and the trial judge, whose finding of abandonment was supported by evidence that “the lack of contact was a direct result of the actions of [respondent] against [Malachii].” It is *1163 my opinion that, perhaps as a result of his criminal conviction, the majority placed too high a burden of production on respondent to demonstrate that he did not abandon his child and allowed the state to sustain its burden of proving' abandonment by less than clear and convincing evidence.
This is so because the majority implicitly turns respondent’s rebuttal evidence against him by treating his conviction, the time he served for his crime, and his compliance with no-contact orders as indications that he abandoned Malachii. The majority then categorizes respondent as an absentee, holding him to the general rule that an incarcerated parent must maintain substantial contact with his child in order to avoid termination of parental rights. See In re Amanda D., 918 A.2d 220, 224 (R.I. 2007).
There is ample support in our case law for the proposition that an incarcerated parent “can abandon a child by not actively engaging in efforts to contact that child, despite having opportunities to do so.” In re DeKarri P., 787 A.2d 1170, 1172 (R.I. 2001) (emphasis added). I am, however, unable to discover a single case in which we have affirmed a judgment for termination on grounds of abandonment where an incarcerated parent’s opportunities for contact were so palpably limited.
The abandonment cases upon which the majority relies almost invariably hinge on the fact that an incarcerated father missed parenting opportunities by “turn[ing] a deaf ear on DCYF’s efforts to help facilitate contact” or failing to coordinate prison visitations. In re DeKarri P., 787 A.2d at 1172; see, e.g., In re Amanda D., 918 A.2d at 224; In re Serenity K., 891 A.2d 881, 884 (R.I. 2006); In re Cody F., 766 A.2d 937, 938 (R.I. 2001). Addressing the no-contact order at issue in this case, the majority reasons that blind compliance with a no-contact order cannot overcome the prima facie evidence of abandonment. However, the case upon which the majority relies involves a no-contact order between a father and mother and it does not establish a sweeping categorical rule. In re Damien M., 819 A.2d 213, 214 (R.I. 2003) (mem.). There, the father was legally barred from- contacting his wife but not his son and, despite having opportunities to coordinate prison visitations, he saw his son only once over the course of a six-year period. Id. Therefore, I cannot accept that In re Damien M. provides a rational foundation for the majority’s opinion.
Perhaps another parent may have been wise enough to seek modifications of the no-contact orders and may have written more letters to DCYF and the Family Court. In using respondent’s failure to do so as evidence of abandonment, however, the majority imposes a requirement of assiduousness and sophistication that goes beyond what our precedent demands. See In re Angelina T., 996 A.2d 623, 627 (R.I. 2010); In re DeKarri P., 787 A.2d at 1172. Further, the majority’s seizure of respondent’s failure to form a case plan as evidence of abandonment is both absent from the trial judge’s decision and utterly unfounded. Case planning is a statutory responsibility of DCYF, and is an endeavor about which respondent was likely unaware. See In re Natalya C., 946 A.2d 198, 204 (R.I. 2008) (“As we expect a doctor, not his patient, to prescribe medicine to treat the patient’s illnesses, we also expect DCYF to fashion effective case plans to enable reunification between parents and children.”).
It is undeniably troubling that respondent made but two attempts over the course of two years to connect Malachii with his family, but I believe that his efforts were sufficient to rebut the presumption of abandonment. Accordingly, it is my view that the majority should have given *1164 more weight to the fact that any possibility of repeated contact was severely hindered. Notably, in declining to adopt a preponderance-of-the-evidence standard for parental termination cases, the United States Supreme Court said that “[a] standard of proof that by its very terms demands consideration of the quantity, rather than the quality, of the evidence may misdirect the factfinder in the marginal case.” Santosky, 455 U.S. at 764, 102 S.Ct. 1388.
It also bears noting that, in affirming the Family Court’s termination decree on the basis of abandonment, the majority did not deem it necessary to address the court’s finding of unfitness on the basis of institutionalization under § 15—7—7(a)(2) (i). To terminate respondent’s parental rights on that ground, the Family Court was required to find as a fact that DCYF made reasonable efforts to reunify respondent •with his son. Section 15—7—7(a)(2)(i), (b)(1). Specifically, DCYF was required to “encourage and strengthen the parental relationship so that the child [could] safely return to the family.” Section 15—7—7(b)(1). Moreover, the agency was required to prove that it made reasonable efforts at reunification “[r]egardless‘ of the unlikelihood for success” until it filed a termination petition. In re Christopher B., 823 A.2d 301, 315 (R.I. 2003) (quoting In re Joseph S., 788 A.2d 475, 477-78 (R.I. 2002)).
With respect to the second ground for termination, it is my opinion that DCYF failed to prove unfitness on the basis of institutionalization because it cannot be disputed that the agency plainly and by design made no efforts to reunite Malachii with his incarcerated father. See In re Natalya C., 946 A.2d at 203. Because the only caseworker assigned to Malachii conceded in her testimony that she eschewed any efforts at reunification, a finding of unfitness on grounds of institutionalization cannot be supported. The fact that the respondent was incarcerated in Massachusetts, in my opinion, does not justify a lack of effort on the part of DCYF to fulfill its statutory duty. See In re Alvia K., 909 A.2d 498, 504 (R.I. 2006).
For the above reasons I respectfully dissent from the holding of the majority in this case.

. It is well settled that ‘‘[t]he burden of [proof] never shifts” although "the 'burden of going forward’ with the evidence * * * shifts from party to party as the case progresses.” Murphy v, O'Neill, 454 A.2d 248, 250 (R.I. 1983). We have defined prima facie evidence as "that amount of evidence that, if unrebut-ted, is sufficient to satisfy the burden of proof on a particular issue.” Paramount Office Supply Co. v. D.A. Maclsaac, Inc., 524 A.2d 1099, 1101 (R.I. 1987) (citing Nocera v. Lembo, 121 R.I. 216, 397 A.2d 524 (1979)) (emphasis added). Accordingly, while the state's prima facie evidence of abandonment shifted a burden of production to respondent, he was capable of shifting the ultimate burden of proof back onto the state by producing some rebuttal evidence. Thereafter, the state was required to prove abandonment by clear and convincing *1162 evidence in light of all the evidence. See Murphy, 454 A.2d at 250.

. Malachii's caseworker received respondent's letter in January 2014, after termination proceedings had begun, and the caseworker determined that, in light of Malachii’s mother’s voluntary relinquishment of parental rights, Malachii was better off in preadoptive care.

. Respectfully, it is my opinion that the majority takes a liberal, even expansive, view of the record when it describes respondent's actions toward Malachii as a "violent, parent-child attack.” No witness testimony justifies such a description. The respondent contended that the abuse conviction was based on his having dropped the child during the course of a physical confrontation with the mother. In any event, what actually happened during the incident leading up to respondent’s conviction is completely irrelevant to the finding of abandonment.