**In re JAZLYN P.**

**No. 2010–387–Appeal.**

Supreme Court of Rhode Island.

Dec. 9, 2011.

Lara Ewens, Esq., Rhode Island Public Defender, for Respondent.

Martha J. Kelly, Esq., Department of Children, Youth & Families, for DCYF.

Shella R. Katz, Esq., Court Appointed Special Advocate, for CASA.

Present: SUTTELL, C.J., GOLDBERG, FLAHERTY, ROBINSON, and INDEGLIA, JJ.

## OPINION

Justice ROBINSON, for the Court.

The respondent father, Michael Patino, appeals from a Family Court decree terminating his parental rights with respect to his daughter, Jazlyn P.[1] On appeal, Mr. Patino argues that the justice of the Family Court who presided over the termination-of-parental-rights trial (1) improperly admitted into evidence certain exhibits during the trial and (2) erred in terminating Mr. Patino's parental rights since, in his view, there was insufficient evidence in the record of cruel and abusive conduct.

This case came before the Supreme Court for oral argument pursuant to an order directing the parties to appear and show cause why the issues raised in this appeal should not be summarily decided.

---

1. This Court recognizes that in the record Jazlyn is referred to as both "Jazlyn P." and "Jazlyn O." For the sake of clarity, we shall refer to her as Jazlyn P. or simply Jazlyn.

After considering the record, the memoranda submitted by the parties, and the oral arguments of counsel, we are satisfied that cause has not been shown and that this appeal may be decided without further briefing or argument.

For the reasons set forth in this opinion, we affirm the decree of the Family Court.

# I

## Facts and Travel

On February 10, 2010, the Rhode Island Department for Children, Youth, and Families (DCYF) filed a petition to terminate the parental rights of Michael Patino and Patricia Oliver[2] with respect to their daughter, Jazlyn P. (born August 6, 2008). As the basis for its petition, DCYF alleged that the parents had "committed, or allowed to be committed, conduct toward any child of a cruel or abusive nature." *See* G.L.1956 § 15–7–7(a)(2)(ii). The petition also alleged that Mr. Patino probably would be unable to care for Jazlyn due to his extended term of imprisonment.[3] On September 22 and October 1, 2010, a trial on the petition to terminate Mr. Patino's parental rights was held in the Family Court.[4] The following factual narrative is derived from the record of the Family Court proceedings.

## A

### The Factual Background

Early in the morning of October 4, 2009, six-year-old Marco Nieves[5] (Ms. Oliver's son and Jazlyn's half-brother) arrived by ambulance at Hasbro Children's Hospital in Providence; Marco was in an unresponsive state due to the deteriorating effects of a perforated bowel. At the time Marco was admitted to the hospital, he had been residing in an apartment in Cranston with his mother and his half-sister, Jazlyn. Marco also had had frequent interactions with Mr. Patino, who was a regular visitor in the Cranston apartment due to both his approximately two-and-a-half-year romantic relationship with Ms. Oliver and the fact that he was Jazlyn's father.

In the face of inquiries both from the rescue personnel who transported Marco to the hospital and from the doctors at the hospital, Ms. Oliver initially refused to provide information as to what she knew concerning the actual origin of Marco's injury. The suspicious nature of Marco's injury and the severity of his condition upon presenting to the hospital led the treating physician (Dr. Kristin Fortin) to complete a "Physician's Report of Examination" (PRE), pursuant to which Marco was placed under a "72–hour hold" as authorized by G.L.1956 §§ 40–11–5(a) and 40–11–6. Tragically, however, despite aggressive

**2.** The Court recognizes that Ms. Oliver is at times also referred to in the record by the name "Tricia." However, for the purposes of this opinion, we shall refer to her as "Ms. Oliver."

**3.** The trial justice based his decision in this case solely on the grounds of cruel and abusive treatment of a child; accordingly, we need not and therefore shall not address the question of what effect Mr. Patino's term of imprisonment might have had on his retention of parental rights. *See Grady v. Narragansett Electric Co.*, 962 A.2d 34, 42 n. 4 (R.I.2009) (noting "our usual policy of not opining with respect to issues about which we need not opine").

**4.** Before the Family Court trial on the petition to terminate parental rights was held, Ms. Oliver voluntarily consented to the adoption of Jazlyn by Ms. Oliver's paternal aunt and uncle; as a result, the Family Court trial addressed solely the issue of whether or not Mr. Patino's parental rights should be terminated.

**5.** The date of birth of Marco Nieves was September 15, 2003.

resuscitative efforts by the medical personnel, six-year-old Marco died in the early evening hours of the day of his admission to the hospital, October 4, 2009.[6]

Manifesting a concern for the well-being of Marco's half-sister, Jazlyn, doctors at Hasbro Children's Hospital requested that she be admitted that same day "for medical evaluation of possible child maltreatment and safety." As had been done with respect to Marco, again invoking §§ 40–11–5(a) and 40–11–6, Dr. Fortin completed a PRE and placed Jazlyn under a seventy-two-hour hold. Upon reviewing x-rays of the fourteen-month-old girl's midsection, Dr. Christine Barron, who was the attending physician and the clinical and fellowship director for the hospital's Child Protection Program [7] (CPP), discovered that Jazlyn had sustained posterior rib fractures that were in the process of healing. When asked about those injuries to her daughter, Ms. Oliver denied that there was any history of either accidental or inflicted trauma.

DCYF obtained temporary custody of Jazlyn on October 5, 2009. Five days later, Ms. Oliver told the DCYF Child Protective Investigator assigned to the case about a purported incident wherein Jazlyn had fallen down the stairs at her paternal grandmother's house in August of 2009. After reviewing the description of the fall and the photographs of the stairs in question, Dr. Barron concluded that Jazlyn's

posterior rib fractures had not been caused by the fall that Ms. Oliver had reported; rather, it was the doctor's opinion that those fractures were "consistent with child physical abuse."

**B**

### The Testimony of Dr. Barron on September 22, 2010

#### 1. The Consultation Reports

On September 22, 2010 (the first day of the termination-of-parental-rights trial), Dr. Barron testified for DCYF as an expert witness with respect to child abuse. Doctor Barron testified that, when she arrived at the hospital on October 4, 2009, Dr. Kristin Fortin was already consulting on Marco's case. Doctor Barron stated that it was Dr. Fortin who had initially spoken to Marco's family members in order to gather a history with respect to Marco's injury. Doctor Barron told the court that she verified the information obtained by Dr. Fortin with Marco's maternal grandmother and with Ms. Oliver. The information which Dr. Barron and Dr. Fortin obtained from these two family members was included in the "Child Protection Program Inpatient Consultation Reports" that were completed with respect to both Marco and Jazlyn at the time of their respective admissions to the hospital.[8]

---

**6.** After Marco's death and the related police investigation, Mr. Patino was charged with first-degree murder. That murder charge against him remains pending.

**7.** Hasbro Children's Hospital established the Child Protection Program in 1996 "[i]n response to the critical need for assessment and treatment of potentially abused children." *Hasbro Children's Hospital, Child Protection Program,* http://www.lifespan.org/hch/ services/childsafe/ (last visited Dec. 2, 2011).
The Child Protection Program provides a full range of services, including comprehen-

sive medical examinations; medical, family, and social history inquiries; and family support services "for children who may have been victims of sexual, physical or emotional abuse, neglect or factitious disorders." *Hasbro Children's Hospital, Child Protection Program: Our Services,* http://www.lifespan.org/ hch/services/childsafe/services.htm (last visited Dec. 2, 2011).

**8.** Doctor Fortin discussed both consultation reports with Dr. Barron, who agreed to the contents thereof. The actual final text of the reports was written and signed by Dr. Fortin.

### 2. Testimony as to Marco's Injuries

Doctor Barron relied on the just-referenced reports to refresh her recollection while testifying at trial as to the details of what occurred on the day that Marco was brought to the hospital. Doctor Barron testified, without objection, that Marco's family members eventually revealed to her that Marco "had sustained a punch or blow to the abdomen" approximately sixteen hours prior to his admission to the hospital, "[c]ausing an injury that resulted in his death." Doctor Barron further testified that Marco had died as a result of "child physical abuse and lack of medical care due to neglect." Doctor Barron also testified that it was her opinion that "[i]f Marco had been brought [to the hospital] with a reported history that he had abdominal trauma, he could have gone to the operating room where the injury to his intraabdominal organs could have been fixed." She further testified that it was her opinion that surgery was not a viable option at the time that he was eventually brought to the hospital.

### 3. Testimony as to Jazlyn's Injuries

During the course of Dr. Barron's testimony concerning the injuries sustained by Jazlyn, DCYF sought to have the above-referenced consultation reports admitted as exhibits 1 and 2. The trial justice admitted the consultation reports into evidence as full exhibits over respondent's objection; the articulated basis for that objection was that Dr. Barron was "here to testify."

Doctor Barron then proceeded to testify that rib fractures such as were sustained by fourteen-month-old Jazlyn were "rare" in a child of that age, and she stated that such fractures "would be consistent with child physical abuse." Doctor Barron also testified that posterior rib fractures are caused by a "squeezing mechanism;" she added that, in her opinion, the posterior rib fractures sustained by Jazlyn were consistent with what she referred to as "inflicted injury."

### 4. Further Testimony as to Marco's Injuries

Later in her testimony, returning to the subject of the cause of Marco's injuries, Dr. Barron stated explicitly that both Ms. Oliver and Marco's maternal grandmother had reported to her "that Marco had been injured by Mr. Michael Patino." At that point in the trial, respondent's counsel objected on the basis that "the information comes from hearsay." In response, the trial justice noted for the record that the information about which Dr. Barron was testifying was contained in the consultation reports that had already been admitted as full exhibits. The respondent's counsel replied that he had objected to the admission of those exhibits, and he pointed out that his objection had been overruled by the court. There then took place a discussion between the trial justice and the parties in an attempt to determine exactly which exhibits respondent's counsel had previously objected to and on what basis. Counsel for DCYF contended that respondent's counsel had objected to exhibits 1 and 2 on the basis that Dr. Barron was present to testify;[9] at that point, respondent's counsel renewed his objection on that same basis. The trial justice then responded that, such being the basis for the objection, the objection was again overruled. It was then that respondent's counsel stated that he was objecting to the "portion of the report * * * that comes from hearsay." The trial justice responded by overruling the latter objection as well.

---

9. It will be recalled that respondent's counsel had objected to admission of the consultation reports on the sole ground that Dr. Barron was "here to testify." *See* section "I B 3" of this opinion, *supra*.

## C

### The Testimony on October 1, 2010

On October 1, 2010, the second day of the trial in Family Court, DCYF called Cranston Detective John Cardone to testify. Detective Cardone testified that he was the detective assigned to the homicide investigation regarding Marco's death. The detective indicated that he and his colleague, one Detective Slaughter,[10] had interviewed Michael Patino on the day that Marco was admitted to the hospital.

Detective Cardone went on to testify that during the interview Mr. Patino had described himself as having been a "father figure" to Marco. However, Detective Cardone further testified that, "in view of the circumstances and the condition * * * of Marco," Mr. Patino had a "very nonchalant, disconnected" demeanor during the interview.

Then, just prior to the point when Detective Cardone was to begin testifying about the substance of the interview, respondent's counsel stated that he had no objection to the transcript of the interview being admitted into evidence "rather than going through this piecemeal;" at the same time, however, he indicated that there were "other materials" to which he did object. The trial justice then questioned whether the interview had already been entered as a full exhibit, and he asked what exhibit number had been assigned to it. Counsel for DCYF indicated that the transcript of the interview was part of exhibit 7, which exhibit also contained Detective Cardone's supplemental narrative detailing his investigation. At that point, the trial justice ruled that the transcript of the interview should be separated from the rest of exhibit 7 and should be designated as exhibit 7A. The trial justice then admitted exhibit 7A into evidence as a full exhibit, without objection from counsel for Mr. Patino.[11]

The transcript of the interview (exhibit 7A) reveals that Mr. Patino admitted to having wrestled with Marco on a bed the day before the boy was admitted to the hospital. During the interview, Mr. Patino stated that he had landed on Marco's midsection when they both fell off the bed. The transcript further reveals that Mr. Patino admitted that he had punched Marco in the ribs after they fell off of the bed. After substantial questioning in the interview, Mr. Patino also acknowledged to the detectives that he had thereafter sent Ms. Oliver a text message in which he admitted having "accidentally" punched Marco.

Lastly, counsel for DCYF asked Detective Cardone to indicate the charge brought against Mr. Patino as a result of the investigation. The respondent's counsel objected to this question on the basis that Mr. Patino was "facing charges;" the trial justice overruled this objection, stating: "If it's obvious, he can testify." The respondent's counsel then objected on the basis that there was not "anything probative [in] the fact that somebody is charged with a crime." The trial justice overruled

---

10. It does not appear that the first name of Detective Slaughter is mentioned anywhere in the record.

11. We recognize that the record is somewhat unclear as to whether or not the portion of exhibit 7 that was *not* severed therefrom and marked as full exhibit 7A was admitted as a full exhibit.

   However, since we are able to decide this case without resolving the evidentiary status of the non-severed portion of exhibit 7 (*i.e.*, whether that portion is a full exhibit or simply an exhibit marked for identification), we express no opinion with respect to that issue. *See Grady*, 962 A.2d at 42 n. 4. In reviewing this appeal, we shall give no consideration to the non-severed portion of exhibit 7 or to that part of Detective Cardone's testimony that was based upon the contents of that exhibit.

the latter objection, stating: "Not if there is proof." Detective Cardone then testified that the charge was "child neglect and then [it was] moved to first degree murder."

DCYF next called Mr. Patino to the stand; he proceeded to assert his Fifth Amendment privilege against self-incrimination in response to each of the questions that he was asked by counsel for DCYF. Mr. Patino's counsel opted not to pose any questions to his client.

## D

### The Trial Justice's Decision

On October 1, 2010, trial testimony having concluded and the closing arguments of counsel having been made, the trial justice rendered a bench decision. The trial justice prefaced his decision with the following strong statement:

> "If I did not terminate this man's rights, I should be pulled off the bench. This case is replete with sufficient evidence, more than sufficient evidence[;] it would be proof beyond a reasonable doubt, which isn't even necessary in a case like this."

The trial justice then delivered his bench decision; he noted what had happened to Marco and stated that "the injuries to [this] six-year-old defies and staggers the imagination, to say the least." He added that the respondent "has committed, or allowed to be committed * * * conduct to a child of a cruel and abusive nature." The trial justice then terminated Mr. Patino's parental rights with respect to Jazlyn.

The decree terminating the parental rights of Mr. Patino was entered on October 19, 2010, and he thereafter filed a timely notice of appeal.

## II

### Issues on Appeal

Mr. Patino argues that the trial justice erred by admitting into evidence as full exhibits the documents marked as exhibits 1 and 2 (*viz.*, the "consultation reports" regarding Marco and Jazlyn respectively), which documents DCYF had proffered. Mr. Patino maintains that those reports contain multiple instances of hearsay and of hearsay within hearsay; he contends that their admission as full exhibits violated the hearsay evidence rule. *See* Rule 802 of the Rhode Island Rules of Evidence. Mr. Patino further contends that there was insufficient evidence in the record to establish by clear and convincing evidence that he acted in a cruel or abusive manner.

## III

### Standard of Review

Natural parents have a fundamental liberty interest in the "care, custody, and management" of their children. *Santosky v. Kramer,* 455 U.S. 745, 753, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982); *see also In re Steven D.,* 23 A.3d 1138, 1154 (R.I. 2011); *In re Destiny D.,* 922 A.2d 168, 172 (R.I.2007). A parent's fundamental liberty interest in his or her child does not "evaporate" simply because he or she has not been a "model" parent or has lost temporary custody of the child. *Santosky,* 455 U.S. at 753, 102 S.Ct. 1388; *see also In re Steven D.,* 23 A.3d at 1154; *In re Natalya C.,* 946 A.2d 198, 202 (R.I.2008); *In re Nicole B.,* 703 A.2d 612, 615 (R.I.1997). Accordingly, due process requires that before a court may terminate a parent's right in his/her child, the state must prove parental unfitness *by clear and convincing evidence.* *Santosky,* 455 U.S. at 769–70, 102 S.Ct. 1388; *see also In re Steven D.,* 23 A.3d at 1161; *In re Victoria L.,* 950 A.2d 1168, 1174 (R.I.2008). However, once that rather daunting burden with respect to unfitness has been met, then "the best interests of the child outweigh all other considerations." *In re Destiney L.,* 21 A.3d 279, 283 (R.I.2011) (internal quotation

marks omitted); *see also In re Charles L.,* 6 A.3d 1089, 1093 (R.I.2010); *In re Destiny D.,* 922 A.2d at 174.

■ In reviewing a decision to terminate a parent's rights, this Court "examine[s] the record to determine if legally competent evidence exists to support the trial justice's findings." *In re Steven D.,* 23 A.3d at 1169 (internal quotation marks omitted); *see also In re Caleb W.,* 990 A.2d 1225, 1228 (R.I.2010); *In re Alexis L.,* 972 A.2d 159, 165 (R.I.2009). The factual findings of the trial justice are entitled to great weight and "will not be disturbed unless it can be shown that they are clearly wrong or the trial justice overlooked or misconceived material evidence." *In re Caleb W.,* 990 A.2d at 1228 (internal quotation marks omitted); *see also In re Alexis L.,* 972 A.2d at 165; *In re Jose Luis R.H.,* 968 A.2d 875, 881 (R.I.2009).

It should also be noted that, in view of the fact that one of the issues before us involves evidentiary rulings (notably concerning the admissibility of exhibits 1 and 2), we review such rulings pursuant to the familiar abuse of discretion standard. *See, e.g., State v. Moreno,* 996 A.2d 673, 678 (R.I.2010); *State v. Breen,* 767 A.2d 50, 59 (R.I.2001); *State v. Gabriau,* 696 A.2d 290, 294 (R.I.1997); *State v. Johnson,* 667 A.2d 523, 530 (R.I.1995).

## IV

### Analysis

#### A

#### The Admission of Exhibits 1 and 2

■ The well-settled "raise or waive" rule of this Court precludes a litigant from raising an issue on appeal that was not properly preserved at trial. *State v. DeOliveira,* 972 A.2d 653, 659 (R.I.2009); *see also State v. Brown,* 9 A.3d 1240, 1245 (R.I.2010); *State v. Bido,* 941 A.2d 822, 828–29 (R.I.2008). An issue is properly preserved—and, as a result, may be raised before this Court on appeal—if the litigant's objection was both "timely and appropriate." *Brown,* 9 A.3d at 1245; *see also State v. Grant,* 840 A.2d 541, 546 (R.I.2004). We have indicated that, "in order to satisfy the strictures of our raise-or-waive rule, an evidentiary objection must be *sufficiently focused* so as to call the trial justice's attention to the basis for said objection * * *." *State v. Diefenderfer,* 970 A.2d 12, 30 (R.I.2009) (emphasis added) (internal quotation marks omitted); *see also* Rule 103(a)(1) of the Rhode Island Rules of Evidence (explicitly requiring, as a precondition to consideration of a claim of error as to the admission of evidence, that "a timely objection or motion to strike appear[ ] of record, stating the specific ground of objection, if the specific ground was not apparent from the context"); *DeOliveira,* 972 A.2d at 659; *Union Station Associates v. Rossi,* 862 A.2d 185, 192 (R.I.2004); *State v. Bettencourt,* 723 A.2d 1101, 1107 (R.I.1999). Accordingly, a general objection at trial will not suffice to preserve an issue for appeal "when the context does not supply the specific ground for the objection." *State v. Feliciano,* 901 A.2d 631, 646 (R.I.2006); *see also DeOliveira,* 972 A.2d at 659. Moreover, when applying Rule 103(a)(1),[12] this Court has held that if "the introduction of evidence is objected to for a specific reason, other

---

12. Rule 103(a)(1) of the Rhode Island Rules of Evidence provides in pertinent part the following:

"(a) * * * Error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected, and

"(1) * * * [i]n case the ruling is one admitting evidence, a timely objection or motion to strike appears of record, stating the specific ground of objection, if the specific ground was not apparent from the context * * *."

grounds for objection are waived and may not be raised for the first time on appeal." *State v. Ucero*, 450 A.2d 809, 815 (R.I. 1982); *see State v. Hallenbeck*, 878 A.2d 992, 1017–18 (R.I.2005); *State v. Neri*, 593 A.2d 953, 956 (R.I.1991).

In the case at hand, when counsel for DCYF moved that exhibits 1 and 2 be admitted into evidence as full exhibits, counsel for Mr. Patino stated his objection as follows: "I guess I'd object to the reports, your Honor, since the witness [Dr. Barron] is here to testify."[13] The trial justice overruled Mr. Patino's counsel's stated objection, and exhibits 1 and 2 were then admitted into evidence as full exhibits.

In arguing on appeal that exhibits 1 and 2 should not have been admitted into evidence, Mr. Patino relies on the objection made by his counsel at a later point during Dr. Barron's testimony, in which he repeated the previously asserted objection to exhibits 1 and 2 and then added an objection on the basis of hearsay. What is fatal to respondent's argument, however, is the fact that, at the earlier point in time when counsel for DCYF had moved for the admission of exhibits 1 and 2, the only objection articulated by respondent's counsel was that Dr. Barron was "here to testify." That objection was certainly not sufficiently focused to direct the trial justice's attention to the hearsay evidence rule, *see Diefenderfer*, 970 A.2d at 30; and the context did not make it apparent that such was the "specific ground" of objection. *See* Rule 103(a)(1); *cf. State v. Baptista*, 894 A.2d 911, 914 n. 2 (R.I.2006) (holding that the defendant's motion *in limine*, which sought to exclude the evidence to which

the defendant later made a general objection at trial, adequately provided the context for determining the specific ground of objection). In addition, since exhibits 1 and 2 had already been admitted as full exhibits when respondent's counsel at a later point in time raised a hearsay objection with respect to those exhibits, that hearsay objection was untimely and therefore waived. *See Brown*, 9 A.3d at 1245 (holding that the defendant's objection was untimely and thus waived because the evidence to which he objected had already been presented to the jury). In view of the clear language of Rule 103(a)(1) and this Court's jurisprudence concerning that Rule we hold that, once Mr. Patino asserted that the basis of his objection was that the witness was there to testify and pointed to no other grounds, he thereby waived the right to appeal on other evidentiary grounds (including the hearsay evidence rule). *See Neri*, 593 A.2d at 956; *see also State v. Reyes*, 984 A.2d 606, 619–20 (R.I. 2009) (holding that the defendant's objection did not suggest that the objected to statement was hearsay, and therefore concluding that the defendant waived appellate review of the hearsay argument).

**B**

**Termination of the Parental Rights of Mr. Patino**

■ The DCYF petition to terminate Mr. Patino's parental rights with respect to Jazlyn alleged that Mr. Patino had "committed, or allowed to be committed, conduct toward [a] child of a cruel and abusive nature." Section 15–7–7(a)(2)(ii) requires that, if a trial justice finds by

---

13. The objection by respondent's counsel that is quoted in the text clearly implied that documentary evidence in the form of exhibits 1 and 2 was unnecessary in view of the fact that a live witness was available to testify. Significantly, however, the objection made absolutely no reference to the hearsay evidence rule.

*See* Rule 802 of the Rhode Island Rules of Evidence ("Hearsay is not admissible except as provided by these rules or by any statute or rule of the United States or Rhode Island prescribed pursuant to statute or constitutional authority.").

clear and convincing evidence that a "parent is unfit by reason of conduct or conditions seriously detrimental to [a] child; such as * * * [c]onduct toward any child of a cruel and abusive nature," the court must terminate all legal rights of the parent to the child.

At trial, DCYF presented the testimony of an expert on child abuse, Dr. Christine Barron, who was also one of the doctors who had treated both Marco and Jazlyn. Doctor Barron stated in unequivocal terms that, in her opinion, Marco's injury was caused by "child physical abuse and lack of medical care due to neglect." Doctor Barron also stated that reports from family members indicated that Marco had sustained a punch or blow to the abdomen, which caused his injuries and subsequent death. Furthermore, the doctor stated that Jazlyn had sustained injuries that were consistent with "inflicted injury."

The testimony of Detective Cardone, who also was called as a witness by DCYF, constituted further evidence that the injuries to Marco were inflicted; the transcript of the interview between Detective Cardone and Mr. Patino revealed that Mr. Patino stated that he had punched Marco in the ribs the day before the boy was admitted to the hospital. During the interview, Mr. Patino also acknowledged sending Ms. Oliver a text in which he admitted to her that he had punched Marco in the ribs.

■ Moreover, this Court has expressly stated: "[T]he state's role in protecting [a child] may properly be preventive of harm as well as remedial. * * * There is no requirement that a court wait until a child is actually harmed before such court provides the protection of the state." *In re Destiny D.,* 922 A.2d at 175 (internal quotation marks omitted); *see also In re Kelly S.,* 715 A.2d 1283, 1289 (R.I.1998) ("[T]he state, under the scrutiny of the court, need not wait until a child's life has

been permanently and irretrievably impaired before acting." (Internal quotation marks omitted.)). As a result, cruel or abusive conduct towards one child in a household can serve as a basis for terminating a parent's rights with respect to another child in the household. *See In re Peter S.,* 973 A.2d 46, 53 (R.I.2009) (affirming the termination of parental rights with respect to all three children in a household and stating that the respondent's expression of regret concerning his violent act towards one child "falls lamentably short of constituting a credible assurance that his other children will not suffer a similar fate"); *see also In re Destiny D.,* 922 A.2d at 175. In fact, this Court has held that "[o]nce a trial justice has found *prima facie* evidence of cruel or abusive conduct on the part of a parent toward one child, the burden of producing evidence of parental fitness shifts to the parent." *In re Peter S.,* 973 A.2d at 53; *see also In re Victoria L.,* 950 A.2d at 1175; *In re Corryn B.,* 914 A.2d 978, 982–83 (R.I.2007).

■ Although the burden of clear and convincing proof of unfitness always remains on the state, once a *prima facie* case has been established, "the parent must present evidence demonstrating that his or her past abusive conduct no longer endangers the safety of a child." *In re Peter S.,* 973 A.2d at 53 (internal quotation marks omitted); *see also In re Victoria L.,* 950 A.2d at 1175.

The record in this case is replete with uncontroverted evidence that Marco suffered an "injury to his intra-abdominal organs," from which he eventually died, as a result of child abuse at the hands of Mr. Patino. We deem that evidence to constitute a *prima facie* case. Indeed, in our judgment, that evidence alone would have sufficed as a basis for the court to have terminated the parental rights of Mr. Patino with respect to Jazlyn. *See generally*

*In re Peter S.,* 973 A.2d at 53. However, the record before us also contains evidence that Jazlyn herself also suffered abuse in the household in which Mr. Patino was a constant presence, making the trial court's decision even more readily sustainable. Moreover, Mr. Patino did not take any steps to produce evidence that his conduct would no longer endanger the safety of Jazlyn; instead, he chose not to call any witnesses, and he also chose to exercise his Fifth Amendment right to refrain from testifying.[14]

The evidence presented concerning the abuse of Marco as well as Dr. Barron's testimony offering her opinion that the injuries sustained by Jazlyn were consistent with "inflicted injury" constituted an ample evidentiary basis upon which the trial justice could conclude that Mr. Patino acted in a "cruel and abusive manner." Having carefully reviewed the entire record, it is our opinion that it contains sufficient evidence to support the trial justice's findings and his conclusion that Mr. Patino "is unfit by reason of conduct or conditions seriously detrimental to the child, and that [he] has committed, or allowed to be committed, * * * conduct [toward any] child of a cruel and abusive nature."

## V

### Conclusion

For the foregoing reasons, we affirm the decree of the Family Court terminating the parental rights of the respondent. The record may be returned to that tribunal.

---

14. *See In re Destiny D.,* 922 A.2d 168, 174 (R.I.2007) ("[I]n the trial of a petition seeking the termination of parental rights, the Fifth Amendment does not forbid the drawing of adverse inferences against a party who refuses to testify.").