**Supreme Court**

No. 2015-179-Appeal.
(12-296-1)

In re Malachii O.                        :

NOTICE: This opinion is subject to formal revision before publication in the Rhode Island Reporter. Readers are requested to notify the Opinion Analyst, Supreme Court of Rhode Island, 250 Benefit Street, Providence, Rhode Island 02903, at Telephone 222-3258 of any typographical or other formal errors in order that corrections may be made before the opinion is published.

Supreme Court

No. 2015-179-Appeal.
(12-296-1)
(Dissenting Opinion begins on Page 13)

In re Malachii O.                          :

Present:  Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ.

**O P I N I O N**

**Justice Goldberg, for the Court.**   This case came before the Supreme Court on

October 25, 2016, on appeal by the respondent, John S.[1] (respondent), from a decree entered in

the Family Court terminating his parental rights as to his son, Malachii O. (Malachii), who was

born on May 21, 2011.  The parties were directed to appear and show cause why the issues raised

in this appeal should not be summarily decided.  After hearing the arguments of counsel and

examining the memoranda filed by the parties, we are of the opinion that cause has not been

shown, and we proceed to decide the appeal at this time.  For the reasons set forth in this opinion,

we affirm the decree of the Family Court.

**Facts and Travel**

In March 2012, after a hotline received a call detailing the episode, the Department of

Children, Youth, and Families (DCYF) was apprised of an alleged incident of domestic violence

that occurred in Massachusetts between respondent and Malachii's mother, which also involved

Malachii.  DCYF was informed that respondent attempted to quell his ten-month-old child's

crying by pinching, slapping, and throwing the child against a wall, which the mother claimed

---

[1]  For the sake of privacy, the family members will be referred to by only their first names.

- 2 -

rendered the child unconscious. On March 7, 2012, a petition for dependency and abuse was filed ex parte against both parents in Rhode Island, where Malachii resided, and respondent was charged in Massachusetts with felony crimes arising from the alleged assault. A no-contact order was issued on March 14, 2012 and entered on April 26, 2012, which prohibited respondent from having any contact with Malachii.[2] On September 27, 2013, respondent was convicted in Massachusetts by a jury of reckless endangerment of a child and assault and battery with a dangerous weapon. He was sentenced to serve three to five years in prison, followed by a two-and-one-half-year probationary term. A second no-contact order was issued in Massachusetts after respondent's conviction. The respondent's conviction was upheld on appeal on November 18, 2015.

On November 25, 2013, DCYF filed a petition to terminate the parental rights of respondent and Malachii's mother.[3] As to respondent, DCYF alleged the following grounds as a basis for termination: (1) respondent was unfit due to his prolonged incarceration, which "render[ed] it improbable for [respondent] to care for [Malachii] for an extended period of time," G.L. 1956 § 15-7-7(a)(2)(i); and (2) respondent abandoned or deserted Malachii, see § 15-7-7(a)(4).[4] Multiple summonses that were issued for respondent were returned unserved because

_____

[2] The order remains in full force and effect and has not been vacated or modified since it was entered.

[3] Malachii's mother voluntarily consented to the termination of her parental rights.

[4] General Laws 1956 § 15-7-7 provides in pertinent part:

> "(a) The court shall * * * terminate any and all legal rights of the parent to the child * * * if the court finds as a fact by clear and convincing evidence that:
>
> "* * *

- 3 -

DCYF had difficulty locating his whereabouts in the Massachusetts prison system. The respondent was relocated in the system on multiple occasions and did not advise DCYF of his location. He eventually was served at the Correctional Center in Shirley, Massachusetts, in May 2014, and an attorney was appointed to represent him in the termination proceeding.[5]

The respondent declined to voluntarily relinquish his parental rights, and the case proceeded to trial on September 22 and 29, 2014. The respondent remained incarcerated in Massachusetts, and the trial was conducted telephonically to afford him the opportunity to participate. At trial, the Family Court justice heard testimony from Barbara Silvia (Silvia), the social caseworker assigned to Malachii's case. She testified that she did not have any contact with respondent because he was incarcerated outside of Rhode Island from the inception of the case in 2012. Silvia detailed that she planned to prepare and discuss a case plan with respondent once he was released from prison because "he can't put services in place with providers while

---

"(2) The parent is unfit by reason of conduct or conditions seriously detrimental to the child; such as * * *

"(i) Institutionalization of the parent, including imprisonment, for a duration as to render it improbable for the parent to care for the child for an extended period of time;

" * * *

"(4) The parent has abandoned or deserted the child. A lack of communication or contact with the child for at least a six (6) month period shall constitute prima facie evidence of abandonment or desertion. In the event that parents of an infant have had no contact or communication with the infant for a period of six (6) months the department shall file a petition pursuant to this section and the [F]amily [C]ourt shall conduct expedited hearings on the petition."

[5] A review of the record indicates that counsel was appointed on June 18, 2014, after respondent submitted an affidavit to attest that he was indigent.

he's incarcerated." She expounded that she was unaware of any programs available for parents incarcerated in Massachusetts, as DCYF does not travel to prisons in other states and she had "never case planned with any client in any other out-of-state prison." Silvia also explained that she did not offer respondent visitation because of the no-contact orders. Although she was aware of respondent's criminal convictions for abusing his son, she did not know when respondent would be released from prison.[6] She was informed that "upon release he could have no unsupervised contact with children under the age of [fourteen], and could not reside in the house with children under the age of [fourteen]." Due to the circumstances, including respondent's status as a child abuser, Silvia testified that respondent "was not a parent that [DCYF was] looking to reunify with at the time." The respondent acknowledged his convictions during his testimony as well,[7] citing his incarceration and the no-contact orders as justification for why he failed to provide support for his son.

Silvia testified that respondent did write two letters.[8] The first letter was sent to the Family Court on August 9, 2012, in which respondent requested a paternity test.[9] Silvia stated that she arranged for the test to be conducted; the results, which confirmed respondent's paternity of Malachii, were received on October 17, 2013. They were forwarded by Silvia, in accordance with usual procedure, to the Family Court. The respondent made no attempt to have contact with his son while the test was pending. At trial, respondent maintained that he never

---

[6] Specifically, Silvia corresponded with a district attorney in Massachusetts regarding the status of respondent's criminal case.

[7] Specifically, respondent acknowledged that he was charged with abusing his child, faced trial on those charges, and was sentenced as a result of the conviction that was entered into evidence. The respondent asserted his Fifth Amendment privilege when directly asked why he was incarcerated, because his appeal was pending at the time.

[8] The respondent testified that he sent a third letter; however, this letter has not been produced.

[9] Silvia did not receive this letter until January 14, 2013.

received the results of the paternity test but stated that he did not contest the paternity of Malachii; rather, he wanted to "establish [his] rights in order to give [Malachii] a place to go, to be with [his] family." The respondent also wrote directly to Silvia on November 11, 2013, more than a year after his first letter to the Family Court. Despite knowing about DCYF's involvement with his son, respondent claimed that he had only recently become aware that Malachii was no longer living with his mother. The respondent asked that Malachii be placed with respondent's parents, who reside in Massachusetts. Silvia testified that she met briefly with respondent's mother and his brother, but Malachii already was residing in a preadoptive home and his mother had consented to an open adoption by the foster parents.

The Family Court justice issued a written decision on January 5, 2015, and ordered the termination of respondent's parental rights to Malachii. The Family Court justice summarized the testimony of Silvia and respondent and took judicial notice of the no-contact order issued in Rhode Island. She began by addressing respondent's procedural arguments relating to service of process and his arraignment, rejecting both. Specifically, the Family Court justice was satisfied after reviewing the summons, hearing the testimony, as well as noting counsel's presence at trial and his invoice for services rendered, that respondent had notice of the termination petition and was adequately represented by counsel.

Turning to the merits of the petition, the Family Court justice found that respondent had been incarcerated continuously from March 2012 for inflicting physical abuse on his child. She explicitly acknowledged that incarceration alone is not grounds for termination of parental rights; however, she concluded that, here, respondent's incarceration was a "direct result of inflicting physical abuse on the child." The Family Court justice found that, despite the no-contact orders, respondent did not make any attempt to seek visitation, case plan, or enroll in any services

offered at the correctional facility where he was housed. These findings, coupled with the length of incarceration and the fact that respondent had not seen his son in more than two years, led the Family Court justice to conclude that respondent would be unable to care for Malachii for an extended period of time. In discussing DCYF's reasonable efforts, the Family Court justice recognized that Silvia faced multiple hurdles due to respondent's out-of-state incarceration and the no-contact orders, concluding that "DCYF made what reasonable efforts it could make based on the situation [respondent] put himself in."

Alternatively, the Family Court justice found that respondent's parental rights could be terminated on the basis that he abandoned Malachii, declaring that the uncontradicted evidence—as well as respondent's own admission—demonstrated that respondent had had no contact with his son since March 2012. She also recognized that respondent provided no financial or emotional support for Malachii.

A decree terminating respondent's parental rights to Malachii was entered in the Family Court on February 5, 2015. A timely appeal was filed in this Court on February 23, 2015.

**Standard of Review**

"On appeal, '[t]his Court reviews termination of parental rights rulings by examining the record to establish whether the [Family Court] justice's findings are supported by legal and competent evidence.'" In re Amiah P., 54 A.3d 446, 451 (R.I. 2012) (quoting In re Victoria L., 950 A.2d 1168, 1174 (R.I. 2008)). "These findings are entitled to great weight, and this Court will not disturb them unless they 'are clearly wrong or the [Family Court] justice overlooked or misconceived material evidence.'" Id. (quoting In re Victoria L., 950 A.2d at 1174).

"Natural parents have a fundamental liberty interest in the 'care, custody, and management' of their children." In re Amiah P., 54 A.3d at 451 (quoting In re Destiny D., 922

A.2d 168, 172 (R.I. 2007)). "Before terminating a parent's rights to his or her child, the [Family Court] justice must find that the parent is unfit." Id. (citing In re Pricillion R., 971 A.2d 599, 604 (R.I. 2009)). "In these cases, the right to due process requires that the state support its allegations by clear and convincing evidence." Id. (citing In re Jazlyn P., 31 A.3d 1273, 1279 (R.I. 2011)). "However, once the [Family Court] justice determines parental unfitness, 'the best interests of the child outweigh all other considerations.'" Id. (quoting In re Jazlyn P., 31 A.3d at 1279).

## Analysis

Before this Court, respondent presents a plethora of arguments, many of which are without merit and can be summarily addressed. The respondent claims that many of the Family Court justice's factual findings were clearly erroneous. For instance, he points to the finding that the paternity testing was requested because respondent contested paternity; respondent professes that he requested paternity to establish his rights. It is, however, undisputed that this incarcerated parent requested a paternity test to verify the one fact that a paternity test discloses—whether he is the child's father. The respondent also maintains that he never received these results; however, Silvia testified that she forwarded the results to the Family Court, and the record discloses that respondent wrote to Silvia less than a month later asking that the child be placed with his family. Regardless, respondent's receipt of the results is immaterial to the Family Court justice's findings.

Additionally, respondent claims that a certified copy of his conviction was not produced at trial. We are satisfied that this circumstance is not material because neither ground for termination required proof of conviction, and the conviction was corroborated by Silvia's and respondent's testimony. See §§ 15-7-7(a)(2)(i); 15-7-7(a)(4). The respondent also posits that the

return of service was neither stamped nor notarized and that he was not arraigned on the petition. However, a careful review of the record reveals that respondent was never found in default; that he was represented by counsel throughout the pendency of the termination petition; and that he was afforded an opportunity to participate at the trial telephonically. See In re Jonathan P., 819 A.2d 198, 201 (R.I. 2003) ("[A]n incarcerated parent defending against a petition for termination of parental rights need only be afforded reasonable participation in that hearing."). We are satisfied that these arguments are immaterial to the outcome of the case.

Of the issues meriting further analysis, respondent argues that the Family Court justice erroneously found that he was unable to care for his son for an extended period of time due to his imprisonment and, alternatively, that he abandoned Malachii. Specifically, respondent claims that he was not advised about Malachii's status and that his incarceration and the no-contact orders prevented him from providing support to the child. With respect to his incarceration as a ground for termination, respondent contends that DCYF failed to establish that it made reasonable efforts to strengthen the parental relationship between respondent and Malachii, as required by § 15-7-7(b)(1). Because we are of the opinion that the Family Court justice correctly concluded that respondent abandoned his son, we need not address § 15-7-7(a)(2)(i) as an additional basis for termination. See In re Rita F., 64 A.3d 1220, 1231 n.12 (R.I. 2013).

**Abandonment**

Section 15-7-7(a)(4) provides for the termination of parental rights if "[t]he parent has abandoned or deserted the child." "A lack of communication or contact with the child for at least a six (6) month period shall constitute prima facie evidence of abandonment or desertion." Id. "Such lack of communication does not have to be willful on the part of the parent." In re Shanelly C., 785 A.2d 1129, 1131 (R.I. 2001) (citing In re Craig G., 765 A.2d 1200, 1202 (R.I.

2001)). The trial justice's findings on abandonment were supported by extensive evidence in the record that respondent had no contact with Malachii for more than two years and minimal contact with DCYF concerning his son.

The respondent concedes that he did not have contact with his son for the presumptive six-month period; however, he argues that he was legally prevented from having contact or providing support. It is manifest in this record that respondent made no attempt to contact his son or to seek visitation by moving for a modification of the no-contact orders. We are not persuaded by respondent's attempt to shift the blame in this case. The fact that respondent was incarcerated and subject to the no-contact orders is solely attributable to respondent's physical abuse of his son. The trial justice found that respondent had had no contact with Malachii since March 2012, well beyond the six-month statutory period for presumptive abandonment. Although respondent was incarcerated and there were no-contact orders in place, these conditions are not foreign to our analysis. In In re Damien M., 819 A.2d 213 (R.I. 2003) (mem.), a father claimed that he did not have contact with his son because he feared that he would violate a no-contact order with the mother. Id. at 214. This Court nonetheless affirmed the trial justice's finding that the father abandoned his son as the father never made an attempt to seek visitation, concluding that "the father's actions spoke louder than his words regarding his intention to develop a relationship with his son." Id.

Likewise, "[t]his Court repeatedly has held that incarceration is not an excuse for failure to maintain contact with one's child for the statutory period." In re Brook Ann R., 994 A.2d 1241, 1244 (R.I. 2010) (citing In re Serenity K., 891 A.2d 881, 884 (R.I. 2005)). "[I]t is 'the parent, not DCYF, whose children are in the care of an authorized agency [who] is responsible to substantially and repeatedly maintain contact with the children.'" In re Amanda D., 918 A.2d

- 10 -

220, 224 (R.I. 2007) (quoting In re Shaylon J., 782 A.2d 1140, 1143 (R.I. 2001)); see also In re Serenity K., 891 A.2d at 884 ("[A] parent in this jurisdiction, incarcerated though he or she may be, 'can abandon a child by not actively engaging in efforts to contact that child, despite having opportunities to do so.'" (quoting In re DeKarri P., 787 A.2d 1170, 1172 (R.I. 2001))). Therefore, neither respondent's incarceration nor the no-contact orders relieved respondent of his obligation to remain in contact with his son.[10]

Furthermore, this Court "has no tolerance for a parent 'who makes halfhearted or no attempts to visit or contact his or her child within the six-month statutory time period * * *.'" In re Abby D., 839 A.2d 1222, 1225 (R.I. 2004) (quoting In re DeKarri P., 787 A.2d at 1172). Here, in a two-and-one-half-year period, respondent wrote but two letters inquiring about Malachii—the first of which demanded a paternity test.[11] That letter, written in August 2012, reveals that respondent was aware of DCYF's involvement—"This issue got [Malachii] taken away by DC[Y]F." However, respondent did not contact DCYF again until November 2013, more than a year later. The record is devoid of proof that respondent made any other efforts to

---

[10] The dissent suggests that a no-contact order relieves the parent of his responsibility to remain in contact with the child. Imposition of no-contact orders to protect the child after a violent, parent-child attack does not toll the running of the six-month prima facie time period for abandonment. Nor should the fact of incarceration for a violent assault upon one's child standing alone serve as evidence to rebut the prima facie showing of abandonment. While the dissent likewise takes issue with our description of the incident as a "violent, parent-child attack," we note that respondent was convicted by a jury in Massachusetts of reckless endangerment of a child and assault and battery by means of a dangerous weapon.

[11] Although the dissent appears to credit respondent's testimony that he only requested a paternity test "to establish his rights to his son so that he could place Malachii with his family[,]" this single request is insufficient evidence to rebut a prima facie showing of abandonment, especially when the child was already happily living in a preadoptive home. Cf. In re Serenity K., 891 A.2d 881, 885 (R.I. 2006) (affirming that four or five attempts to contact DCYF and arrange visits over a nineteen-month period were insufficient to rebut the prima facie showing of abandonment).

inquire into his son's welfare.[12]  Although respondent requested a paternity test, placement with his family, and appointment of his mother as Malachii's legal guardian, he never sought visitation, modification of the no-contact orders, or other updates, save for the paternity test.  A fair reading of respondent's letters suggests that he cared for the child; however, we have previously held that "§ 15-7-7(a)(4)[] does not include the element of willfulness to show abandonment."  In re Craig G., 765 A.2d at 1202.  Moreover, respondent did not support Malachii in any way, either financially or emotionally.  Many a birthday and Christmas passed without so much as an inquiry about his child.

We recognize that the respondent was faced with minimal options; nonetheless, we cannot ignore the fact that the respondent's behavior toward his son has placed him in this position.  As the Family Court justice explicitly acknowledged, the respondent's "incarceration was a direct result of inflicting physical abuse on the child."  We decline to lower the threshold required to rebut the prima facie period of abandonment for this particular respondent because of the scarce options available when that situation lies squarely at his feet.  DCYF has no obligation to undertake reasonable efforts to strengthen the parental bond or to reunify, when a parent is deemed unfit on the basis of abandonment.  Section 15-7-7(b)(1).  Accordingly, the lack of contact and communication falls squarely with the respondent.  The record clearly indicates that the respondent had the addresses for both the Family Court and DCYF, and he was also represented by counsel in Massachusetts.  Yet, despite additional opportunities, the respondent made but two attempts to communicate with DCYF and utterly failed to seek contact with his child.  Therefore, we are satisfied that the Family Court justice properly held that the respondent

---

[12] The 2012 letter did direct that the recipient forward any questions or updates to an address in New Bedford, Massachusetts.  However, this request appeared immediately after the contact information for respondent's then-attorney and appears to relate to correspondence arising out of the paternity test, not Malachii's welfare in general.

abandoned Malachii because he had had no meaningful contact with his son since March 2012. See In re Shanelly C., 785 A.2d at 1132 (concluding that sending clothes, books, and candy was "indirect contact indicative of an unwillingness to promote and further the parent-child relationship").

## Conclusion

For these reasons, the respondent's appeal is denied and dismissed. The decree of the Family Court terminating the parental rights of the respondent is affirmed. The papers in this case are remanded to the Family Court.

**Justice Flaherty, dissenting.** I respectfully dissent from the holding of the majority in this case. I do so because it is my opinion that the respondent has sufficiently rebutted the prima facie evidence of abandonment, thereby triggering an obligation for the Department of Children, Youth, and Families (DCYF) to prove that he abandoned his child by clear and convincing evidence. In my view, this has not been done.

There is no doubt that respondent was confronted by substantial obstacles that stood in the way of contacting his son. He was incarcerated in another state and was apparently moved from facility to facility. Indeed, DCYF, with all its impressive resources, found it difficult to locate respondent, even for the purpose of serving him with process after it filed its termination case.

The majority holds that respondent abandoned his son because he did not adequately maintain contact with Malachii over the course of roughly two years. While it is true that there was a paucity of contact initiated by respondent, it is extremely significant that he was barred from contacting Malachii, and the state agency that had custody of Malachii never contacted

respondent.  Notwithstanding his incarceration and the other legal barriers to communication, respondent did make two efforts, through DCYF, to reunify Malachii with his family.  In light of this, and after carefully reviewing the record, I conclude that the trial justice erred, that respondent has rebutted the prima facie inference of abandonment, and that his unfitness by means of abandonment was not proven by clear and convincing evidence.

We have long recognized that "[n]atural parents have a fundamental liberty interest in the care, custody, and management of their child that does not evaporate if they are not model parents or have lost temporary custody of their child."  In re Antonio G., 657 A.2d 1052, 1057 (R.I. 1995) (citing Santosky v. Kramer, 455 U.S. 745, 753 (1982)).  The "rights to the custody, care, and nurturing of a child first reside with the parents, and 'until the [s]tate proves parental unfitness, the child and his parents share a vital interest in preventing erroneous termination of their natural relationship.'"  In re Kristen B., 558 A.2d 200, 203 (R.I. 1989) (quoting Santosky, 455 U.S. at 760).  The state has the ultimate burden of proving unfitness by clear and convincing evidence.  General Laws 1956 § 15-7-7(a).

Although the trial justice terminated respondent's parental rights on the bases of abandonment and institutionalization, the majority affirms the Family Court's finding of unfitness solely on the basis of abandonment.  As the majority correctly notes, DCYF is not required to make reasonable efforts at reunification before the agency institutes termination proceedings on grounds of abandonment.  Section 15-7-7(a)(4), (b)(1).  The state may also present prima facie evidence of abandonment by proving that more than six months have passed during which a parent did not contact his or her child.  Section 15-7-7(a)(4).

Here, respondent did not contest the fact that he had not seen Malachii for a period in excess of six months.  Nonetheless, it bears noting that the state bore a heavier burden in proving

- 14 -

the ultimate fact of unfitness than respondent did in producing some evidence to rebut the state's basic prima facie showing. See § 15-7-7(a).[1]

In my view, respondent rebutted the prima facie evidence of abandonment when he demonstrated that he was legally and practically precluded from contacting his son during the time in which the state claims he abandoned Malachii. It should go without saying that DCYF had a unique ability to increase the prospects for family reunification, slight as they may have been, during the relevant time period because the child was in its custody. Rather than explore those prospects for reunification, however, DCYF foreclosed them. It is my opinion that the events leading up to the Family Court's termination decree leads to the inevitable conclusion that the agency helped "to shape the historical events that form[ed] the basis for termination." Santosky, 455 U.S. at 763.

The respondent lost custody of Malachii following a violent domestic altercation in March 2012, in which his then ten-month-old son was injured. Shortly thereafter, the Family Court issued a no-contact order, an order that remains in effect to this day. That order unequivocally bars respondent from contacting Malachii.

For his part, respondent requested a paternity test in August 2012. The respondent said that he requested the test to establish his rights to his son so that he could place Malachii with his family. In September 2013, respondent was convicted of reckless endangerment of a child and

---

[1] It is well settled that "[t]he burden of [proof] never shifts" although "the 'burden of going forward' with the evidence * * * shifts from party to party as the case progresses." Murphy v. O'Neill, 454 A.2d 248, 250 (R.I. 1983). We have defined prima facie evidence as "that amount of evidence that, if unrebutted, is sufficient to satisfy the burden of proof on a particular issue." Paramount Office Supply Co. v. D.A. MacIsaac, Inc., 524 A.2d 1099, 1101 (R.I. 1987) (citing Nocera v. Lembo, 121 R.I. 216, 397 A.2d 524 (1979)) (emphasis added). Accordingly, while the state's prima facie evidence of abandonment shifted a burden of production to respondent, he was capable of shifting the ultimate burden of proof back onto the state by producing some rebuttal evidence. Thereafter, the state was required to prove abandonment by clear and convincing evidence in light of all the evidence. See Murphy, 454 A.2d at 250.

assault and battery with a dangerous weapon, for which he received a sentence of three to five years with two-and-a-half years of probation.

Armed with the no-contact order, DCYF then unilaterally determined that it would not attempt to reunify respondent with his son. Malachii's caseworker testified that "[b]ecause there was a no-contact order in place between [respondent] and the child, * * * he was not a parent that we were looking to reunify * * *."

A month after respondent had begun to serve his sentence, his paternity was verified. The respondent then sent a letter to Malachii's caseworker asking that Malachii be placed with his grandparents and for respondent's mother to be appointed as Malachii's legal guardian. Shortly thereafter, DCYF instituted proceedings to terminate respondent's parental rights.[2]

It is significant that, for some reason, the state opted not to charge respondent with unfitness on the ground of cruelty to a child, even though he had been criminally punished for the child's injuries. Section 15-7-7(a)(2)(ii).[3] Nonetheless, it seems obvious to me that the criminal conviction in Massachusetts plainly influenced the decisions of the majority of this Court and the trial judge, whose finding of abandonment was supported by evidence that "the lack of contact was a direct result of the actions of [respondent] against [Malachii]." It is my opinion that, perhaps as a result of his criminal conviction, the majority placed too high a burden

---

[2] Malachii's caseworker received respondent's letter in January 2014, after termination proceedings had begun, and the caseworker determined that, in light of Malachii's mother's voluntary relinquishment of parental rights, Malachii was better off in preadoptive care.

[3] Respectfully, it is my opinion that the majority takes a liberal, even expansive, view of the record when it describes respondent's actions toward Malachii as a "violent, parent-child attack." No witness testimony justifies such a description. The respondent contended that the abuse conviction was based on his having dropped the child during the course of a physical confrontation with the mother. In any event, what actually happened during the incident leading up to respondent's conviction is completely irrelevant to the finding of abandonment.

of production on respondent to demonstrate that he did not abandon his child and allowed the state to sustain its burden of proving abandonment by less than clear and convincing evidence.

This is so because the majority implicitly turns respondent's rebuttal evidence against him by treating his conviction, the time he served for his crime, and his compliance with no-contact orders as indications that he abandoned Malachii. The majority then categorizes respondent as an absentee, holding him to the general rule that an incarcerated parent must maintain substantial contact with his child in order to avoid termination of parental rights. See In re Amanda D., 918 A.2d 220, 224 (R.I. 2007).

There is ample support in our case law for the proposition that an incarcerated parent "can abandon a child by not actively engaging in efforts to contact that child, despite having opportunities to do so." In re DeKarri P., 787 A.2d 1170, 1172 (R.I. 2001) (emphasis added). I am, however, unable to discover a single case in which we have affirmed a judgment for termination on grounds of abandonment where an incarcerated parent's opportunities for contact were so palpably limited.

The abandonment cases upon which the majority relies almost invariably hinge on the fact that an incarcerated father missed parenting opportunities by "turn[ing] a deaf ear on DCYF's efforts to help facilitate contact" or failing to coordinate prison visitations. In re DeKarri P., 787 A.2d at 1172; see, e.g., In re Amanda D., 918 A.2d at 224; In re Serenity K., 891 A.2d 881, 884 (R.I. 2006); In re Cody F., 766 A.2d 937, 938 (R.I. 2001). Addressing the no-contact order at issue in this case, the majority reasons that blind compliance with a no-contact order cannot overcome the prima facie evidence of abandonment. However, the case upon which the majority relies involves a no-contact order between a father and mother and it does not establish a sweeping categorical rule. In re Damien M., 819 A.2d 213, 214 (R.I. 2003) (mem.).

There, the father was legally barred from contacting his wife but not his son and, despite having opportunities to coordinate prison visitations, he saw his son only once over the course of a six-year period. Id. Therefore, I cannot accept that In re Damien M. provides a rational foundation for the majority's opinion.

Perhaps another parent may have been wise enough to seek modifications of the no-contact orders and may have written more letters to DCYF and the Family Court. In using respondent's failure to do so as evidence of abandonment, however, the majority imposes a requirement of assiduousness and sophistication that goes beyond what our precedent demands. See In re Angelina T., 996 A.2d 623, 627 (R.I. 2010); In re DeKarri P., 787 A.2d at 1172. Further, the majority's seizure of respondent's failure to form a case plan as evidence of abandonment is both absent from the trial judge's decision and utterly unfounded. Case planning is a statutory responsibility of DCYF, and is an endeavor about which respondent was likely unaware. See In re Natalya C., 946 A.2d 198, 204 (R.I. 2008) ("As we expect a doctor, not his patient, to prescribe medicine to treat the patient's illnesses, we also expect DCYF to fashion effective case plans to enable reunification between parents and children.").

It is undeniably troubling that respondent made but two attempts over the course of two years to connect Malachii with his family, but I believe that his efforts were sufficient to rebut the presumption of abandonment. Accordingly, it is my view that the majority should have given more weight to the fact that any possibility of repeated contact was severely hindered. Notably, in declining to adopt a preponderance-of-the-evidence standard for parental termination cases, the United States Supreme Court said that "[a] standard of proof that by its very terms demands consideration of the quantity, rather than the quality, of the evidence may misdirect the factfinder in the marginal case." Santosky, 455 U.S. at 764.

It also bears noting that, in affirming the Family Court's termination decree on the basis of abandonment, the majority did not deem it necessary to address the court's finding of unfitness on the basis of institutionalization under § 15-7-7(a)(2)(i). To terminate respondent's parental rights on that ground, the Family Court was required to find as a fact that DCYF made reasonable efforts to reunify respondent with his son. Section 15-7-7(a)(2)(i), (b)(1). Specifically, DCYF was required to "encourage and strengthen the parental relationship so that the child [could] safely return to the family." Section 15-7-7(b)(1). Moreover, the agency was required to prove that it made reasonable efforts at reunification "[r]egardless of the unlikelihood for success" until it filed a termination petition. In re Christopher B., 823 A.2d 301, 315 (R.I. 2003) (quoting In re Joseph S., 788 A.2d 475, 477-78 (R.I. 2002)).

With respect to the second ground for termination, it is my opinion that DCYF failed to prove unfitness on the basis of institutionalization because it cannot be disputed that the agency plainly and by design made no efforts to reunite Malachii with his incarcerated father. See In re Natalya C., 946 A.2d at 203. Because the only caseworker assigned to Malachii conceded in her testimony that she eschewed any efforts at reunification, a finding of unfitness on grounds of institutionalization cannot be supported. The fact that the respondent was incarcerated in Massachusetts, in my opinion, does not justify a lack of effort on the part of DCYF to fulfill its statutory duty. See In re Alvia K., 909 A.2d 498, 504 (R.I. 2006).

For the above reasons I respectfully dissent from the holding of the majority in this case.

**SUPREME COURT – CLERK'S OFFICE**

**OPINION COVER SHEET**

| | |
|---|---|
| **Title of Case** | In re Malachii O. |
| **Case Number** | No. 2015-179-Appeal.<br>(12-296-1) |
| **Date Opinion Filed** | January 31, 2017 |
| **Justices** | Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ. |
| **Written By** | Associate Justice Maureen McKenna Goldberg |
| **Source of Appeal** | Providence County Family Court |
| **Judicial Officer From Lower Court** | Associate Justice Karen Lynch Bernard |
| **Attorney(s) on Appeal** | For Petitioner:<br><br>Karen A. Clark<br>Department of Children Youth & Families<br><br>Shilpa Naik<br>Court Appointed Special Advocate |
| | For Respondent:<br><br>Catherine Gibran<br>Office of the Public Defender |